672 S.E.2d 556

**The STATE, Respondent,**

v.

**Kevin MERCER, Appellant.**

No. 26582.

Supreme Court of South Carolina.

Heard Oct. 7, 2008.

Decided Jan. 12, 2009.

Rehearing Denied Feb. 19, 2009.

150

Deputy Chief Appellate Defender for Capital Appeals Robert M. Dudek, of South Carolina Commission on Indigent Defense, and Melissa Jane Reed Kimbrough, of Kimbrough & Taggart, both of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General S. Creighton Waters, all of Columbia; Solicitor Donald V. Myers, of Lexington, for Respondent.

Justice KITTREDGE:

This is a mandatory appeal from a sentence of death. On March 16, 2002, Army recruiter Sergeant First Class Tracy Davis was gunned down outside his apartment in Lexington County, South Carolina. Kevin Mercer (Mercer) was convicted of murder, armed robbery, and possession of a firearm in the commission of a violent crime, and sentenced to death. In his appeal, Mercer challenges: (1) the disqualification of a juror; (2) the exclusion of evidence, both in the guilt and sentencing phases; (3) the denial of his post-trial motion for additional funds to test gloves for gunshot residue; and (4) the denial of his post-trial motion for a new trial based on after-discovered evidence. We affirm.

## I.

Prior to his death, Sergeant First Class Tracy Davis (Davis) lived near Columbia, South Carolina, where he served as an active-duty member of the United States Army. He was attached to Fort Jackson where he trained Army recruiters.

On the evening of March 16, 2002, Davis arrived home at approximately 11:30 P.M. to the Raintree Apartments. As was his custom, he backed his vehicle, a white Lincoln Navigator, into a parking spot outside his apartment. According to a witness, after exiting his truck, Davis encountered a man and words were apparently exchanged.

The witness to the encounter was Davis's roommate, Sergeant First Class Clifton Magwood (Magwood). Magwood witnessed the confrontation from an apartment window. Magwood's room is on the second floor of the apartment, and his window looks out over the parking lot. Magwood testified that he heard a disturbance, got out of bed, looked through his blinds and observed Davis with a heavyset man, apparently armed with a handgun, demanding the keys to Davis's vehicle. Magwood saw the robber forcing Davis toward the rear of the vehicle and heard Davis tell the armed man, "All right. I'll give it to you."

Magwood left his vantage point to call 911 and summon help. The 911 call was logged at 11:32 P.M. Shortly thereafter, while running downstairs to help his roommate, Magwood heard a gunshot; he hurried outside to find Davis lying in the bushes near the parking lot. Magwood saw Davis's Navigator leaving the apartment complex. Davis died as a result of a gunshot to the back of the head.

Magwood only saw one individual confront Davis with a gun. Although Magwood only saw the individual from the back, he provided an immediate and detailed description of the assailant to law enforcement. The suspect was described as "a black male"; "broad shoulders"; "heavy build, muscular"; anywhere from 5'11" to 6'2" and weighing "215 to 225." Magwood further described the suspect's clothing as "a dark outfit, could be jean or denim or some type of dark outfit with a dark hat."

Magwood's detailed description of the killer, along with a description of the Navigator, was dispatched to all officers in the vicinity, by way of a "be on the lookout," commonly referred to as a BOLO. Deputy Dennis Stazer of the Lexington County Sheriff's Office responded to the BOLO broadcast by positioning his patrol car (at 11:42 P.M.) at what he believed could be an intercept position on a nearby interstate, I–20. Within minutes, a white Navigator drove past Deputy Stazer's location. Deputy Stazer pulled in behind the suspect vehicle and initiated a traffic stop at 11:50 P.M.

There were two black males in the Navigator, Mercer in the driver's seat and Marcus Thompson in the front passenger's seat. Deputy Stazer utilized his patrol car's "light bar ... to light up the interior of the [Navigator]." Deputy Stazer approached the driver's side and asked the driver (Mercer) for his license and registration. Mercer produced his license, but could not find the vehicle registration. Mercer eventually located a receipt from a car dealership and handed it to Deputy Stazer. The receipt confirmed that the Navigator belonged to the murder victim, Davis. Mercer and Thompson were taken into custody.

Inside the Navigator, a .357 caliber handgun was retrieved from under the driver's seat.[1] Testing matched the handgun to the bullet removed from Davis during the autopsy. Gunshot residue (GSR) testing done on Mercer's hands revealed materials considered to be consistent with GSR, although the test results were not conclusive. Testing done on Thompson's hands resulted in a negative test for GSR. Four gloves (two pairs) were found in Thompson's possession but were not tested for GSR. As Thompson was removed from the vehicle, a plastic bag containing fourteen .357 bullets "fell out of his pants legs."

---

1. Deputy Stazer did not testify to seeing a handgun when he first approached the driver's window. Moreover, Deputy Stazer, who "had to keep [his] eyes on both of them," saw no movement from either Mercer or Thompson. Deputy Stazer testified that had there been any movement in the vehicle he considered as a threat, he would have responded with deadly force. This testimony concerning the lack of movement, especially by Thompson, acquires relevance when read in context with Mercer's post-trial motion for a new trial based on after-discovered evidence.

Mercer matched the detailed description of the assailant furnished by Magwood. Mercer is 5 feet 10 inches tall and weighs 220 pounds.[2] The officers on the scene of the arrest confirmed that Mercer is a broad-shouldered, muscular individual, consistent with Magwood's description. Mercer was arrested wearing a "dark[,] ... like a denim ... jean jacket outfit"; he was also wearing "a black ... baseball style cap."

Conversely, Thompson is "very slender" and "narrow-shouldered" and weighs about 150 pounds. At the time of his arrest, Thompson was wearing "a black tee shirt that was over a white tee shirt," with the white tee shirt conspicuously sticking out from the black tee shirt. Thompson was not wearing a hat.

Mercer and Thompson were charged with murder, armed robbery, possession of a firearm during the commission of a violent crime, and criminal conspiracy. Based on the State's view of the evidence, Thompson pled guilty to accessory before the fact of armed robbery, and accessory after the fact of murder, and armed robbery; he was sentenced to 28 years in prison. Mercer's charges proceeded to trial with the State seeking the death penalty. Mercer pursued a third-party guilt defense, pointing to Thompson as the shooter. The jury convicted Mercer, with the jury ultimately recommending a sentence of death, from which Mercer appeals.

## II.

Mercer raises six issues on appeal, which we place in four categories:

(1) Whether the trial court abused its discretion in finding a juror not death penalty qualified under *Wainwright v. Witt.*

(2) Whether the trial court abused its discretion during the guilt phase by excluding the testimony of Thompson's attorney "that Thompson was charged as only an accessory after the fact and that he was released on bond."

---

**2.** This height and weight is taken from Mercer's driver's license which he produced to Deputy Stazer. There is nothing in the record that contradicts this description.

(3) Whether the trial court abused its discretion during the penalty phase by (a) precluding Dr. John Steedman from opining that a "SPECT Scan" of Mercer's brain revealed an "abnormality"; and (b) precluding Dr. Steedman from offering expert psychiatric opinion testimony.

(4) Whether the trial court abused its discretion in denying Mercer's post-trial motions, one seeking additional funds to test Thompson's gloves for gunshot residue; and a second motion for a new trial based on after-discovered evidence that Thompson confessed to a cellmate that he committed the murder.

## III.

### *Juror John Doe* [3] *and Wainwright v. Witt*

■ Mercer claims the disqualification of Juror John Doe violated his Sixth and Fourteenth Amendment rights. We disagree. In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court stated that the critical issue regarding the disqualification of a capital juror is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424, 105 S.Ct. 844 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). The *Wainwright* Court observed that a juror's bias need not be "proved with 'unmistakable clarity' ... [because] bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Id.* at 424, 105 S.Ct. 844. Finally, the *Wainwright* Court noted that "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law ... [and that] is why deference must be paid to the trial judge who sees and hears the juror." *Id.* at 425–26, 105 S.Ct. 844. It is with this standard in mind that we address whether the trial court abused its discretion in disqualifying Juror John Doe.

We have carefully reviewed the lengthy colloquy involving Juror Doe. While it is possible to cherry-pick certain responses and perhaps conclude that Juror Doe is qualified, a review

---

3. We use the pseudonym John Doe.

of the totality of the responses reveals a potential juror vacillating and struggling with his strong convictions against the death penalty. Juror Doe, without hesitation, expressed an ability to impose a life sentence. Conversely, when the trial court asked if the juror could vote for a sentence of death, Juror Doe responded, "I'm not sure, sir."

The State followed the court's questioning by pursuing the same line of inquiry, to which Juror Doe responded that "it's just hard to judge, you know, someone else . . . for something that they've done." Following up, the State zeroed in on Juror Doe's reservations, asking whether Juror Doe could sign his name to a death penalty verdict, to which Doe responded, "I don't think so, sir."

Defense counsel attempted to rehabilitate Juror Doe, but without much success. Doe stated he would "try" to consider both options. The trial court permitted both sides to vet Juror Doe thoroughly. Doe answered, "probably so," when asked if his feelings would interfere with serving on the jury. And when Doe was asked, "if you were convinced that a death sentence was appropriate that you could sign that form along with the other jurors," he answered, "[t]hat goes back to like having to put my name on the line you said when—for a death sentence. I'd still have to think about that."

The trial court concluded that Juror John Doe was not qualified under *Wainwright*:

I think the juror is not qualified. . . . There's several things that I think need to be mentioned, and the first is the juror's demeanor. . . . I believe that . . . this juror's views on capital punishment would substantially impair his ability to perform his duties as a juror in accordance with the instructions that I would give him.

. . . A lot of times I think we see jurors who hesitate . . . [and] I feel as though I can get a sense as to whether the juror is hesitating because they are trying to think deeply and be completely open and honest with us or are they hesitating because they are troubled by the . . . issue that they're about to discuss.

I did not get the impression, as I do sometimes, that this juror hesitated because he was trying to be clear about his feelings. I got the impression that he hesitated because he was troubled by . . . what he thought would be the question

of whether or not he would be able to impose the death penalty.... And in the end I am left ... with the impression that ... this juror's views on the death penalty would substantially impair his performance of his duty to ... follow the instructions that I would give him. And so I find that he is disqualified.

We find the trial court acted well within its broad discretion. in finding Juror Doe's views would substantially impair his ability to follow his oath and the court's instructions on the law. *See Uttecht v. Brown,* 551 U.S. 1, 9, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007) ("Deference to the trial court is appropriate [which necessarily involves granting the trial court broad discretion] because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."); *State v. Wood,* 362 S.C. 135, 141, 607 S.E.2d 57, 60 (2004) (adhering to the rule that a "trial court's disqualification of a prospective juror will not be disturbed where there is a reasonable basis ... [to] conclude[] that the juror would not have been able to faithfully discharge his responsibilities as a juror"); *State v. Council,* 335 S.C. 1, 10, 515 S.E.2d 508, 512 (1999) (following the rule that unless unsupported by the evidence, "determination of whether a juror is qualified to serve on a death penalty case is within the sole discretion of the trial judge"). Even the cold record before us reflects Juror Doe's hesitancy and profound unease with the prospect of performing his duties as a juror in accordance with his oath and the court's instructions. *State v. George,* 323 S.C. 496, 503, 476 S.E.2d 903, 908 (1996) (finding that the trial court acted correctly by disqualifying a juror that "declared that she did not think she could sign a form recommending the death penalty"); *State v. Longworth,* 313 S.C. 360, 366, 438 S.E.2d 219, 222 (1993) (disqualifying a juror who initially stated "he 'probably could' consider" the death penalty but later stated he did not "think so"). We affirm the disqualification of Juror John Doe.

## IV.

### *Exclusion of Marcus Thompson's Lawyer's Testimony*

During the guilt phase, Mercer sought to introduce testimony from Thompson's lawyer regarding the reduced charges

against Thompson.[4] Specifically, Mercer wanted to introduce testimony that he and Thompson were initially charged with the same offenses, but later Thompson's charges were reduced and he was released on bond. Mercer claimed the information was relevant as part of his defense of third-party guilt. The State objected to this testimony, asserting that it was not relevant to third-party guilt or otherwise. The trial court sustained the objection. Finding the proffered testimony of Thompson's attorney concerning Thompson's reduced charges and bail status not relevant to any issue before the jury, including third-party guilt, we affirm pursuant to Rule 220(b)(1), SCACR.[5]

## V.

### *Exclusion of Expert Mitigation Evidence*

Mercer retained numerous well-credentialed experts for the penalty phase, including a neurologist, a forensic psychiatrist, a pharmacologist, a sociologist licensed as a clinical social worker, and a corrections expert. During the penalty phase, the defense presented a comprehensive review of Mercer's troubled life.

The mitigation evidence revealed much about Mercer. A sampling of the evidence reveals that Mercer has a "damaging disability in terms of . . . making judgment[s] and inferences" and that he suffers from "untreated depression." The experts opined that Mercer's abusive upbringing resulted in post-traumatic stress disorder and anxiety disorder, which "are connected with previous trauma, nightmares[,] . . . distressive recollections" and substance abuse. Beyond Mercer's life experiences, he suffered from a myriad of cognitive deficiencies, including neurological dysfunction and learning disabilities. Because Mercer struggled from an early age to function

---

4. Neither the State nor Mercer called Thompson as a witness.

5. Although this evidence was not admissible, we do recognize that defense counsel, in her opening remarks to the jury, referred to Thompson's reduced charges and bond status. According to counsel's opening statement, "We don't know where [Thompson] is. Last time I heard he was out on bond. Last time I heard he wasn't even charged with murder or armed robbery. That wasn't how it started out. He was charged with all the same things that Kevin Mercer was."

in life and hold regular employment, he was found to be disabled by the Social Security Administration.

 Against this backdrop of a thorough mitigation presentation, we are presented with two challenges to the trial court's exclusion of expert testimony in the penalty phase. "A ruling on the admissibility of evidence is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. An abuse of discretion occurs when the trial court's ruling is based on an error of law." *State v. Washington*, 379 S.C. 120, 123–24, 665 S.E.2d 602, 604 (2008) (internal citations omitted).

We first address the claim that the trial court abused its discretion in preventing Dr. John Steedman from opining that a "SPECT Scan" of Mercer's brain revealed an "abnormality." While we agree that it was clear error to exclude this testimony, we do not find that Mercer was prejudiced by the error. Next is the assignment of error in connection with the trial court precluding Dr. Steedman from offering psychiatric opinion testimony. Again, we find no reversible error.

A. "SPECT Scan"

 Dr. Steedman is a medical doctor who is board certified in neurology and psychiatry. Dr. Steedman analyzed a "SPECT Scan" conducted on Mercer's brain.[6] The SPECT Scan was initially reviewed by a radiologist who noted a "questionable abnormality." Dr. Steedman was prepared to render a stronger finding of an abnormality. The State objected strenuously against such testimony, claiming surprise

---

6. SPECT is an acronym for single-photon emission computerized tomography. Richard E. Redding, *The Brain–Disordered Defendant: Neuroscience and Legal Insanity in the Twenty–First Century*, 56 Am. U.L.Rev. 51, 121 (2006). According to Dr. Steedman, "a SPECT scan is a … nuclear medicine study. It is … a way of looking at the function of somebody's brain in terms of how much blood flow is running through the cortex. It's mainly useful in detecting whether there are asymmetries and regional differences in blood flow … to parts of the brain which indicates … how hard those parts of the brain are working." An abnormal SPECT scan means there is either increased or decreased blood flow to a certain area in the brain. A decreased flow of blood to a particular region of the brain may be referred to as an abnormality and may be associated with general cognitive deficiencies and learning disorders.

and prejudice. After an offer of proof and lengthy discussion, the trial court sustained the objection on the basis of Rule 403, SCRE, and a so-called "discovery order" violation. This ruling rises to the level of an abuse of discretion.

Application of Rule 403 should be cautiously invoked against a capital defendant in the penalty phase, especially in light of the due process implications at stake when a capital defendant seeks to introduce mitigation evidence.[7] The probative value of Dr. Steedman's excluded testimony was, as a matter of law, not substantially outweighed by its potential for prejudice, as a result of the purported late disclosure or otherwise. Reliance on the so-called "discovery order" cannot withstand even minimal scrutiny, for there was no formal discovery order.[8] In any event, Dr. Steedman was disclosed to the State, as was the general substance of his testimony.

We nevertheless find no reversible error. When the entirety of the record is considered, the exclusion of Dr. Steedman's proffered testimony of an abnormality juxtaposed to the radiologist's notation of a "questionable abnormality" resulted in no prejudice to Mercer. Despite the erroneous ruling, a review of the record demonstrates that Dr. Steedman testified at

7. This Court reminds the bench and bar of the importance of a meaningful mitigation defense and, concomitantly, the ability of a capital defendant to fully present mitigation evidence. *See Council v. State*, 380 S.C. 159, 670 S.E.2d 356 (2008) (relying in large part upon *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), this Court determined that counsel's failure to adequately investigate and present mitigating evidence resulted in the ineffective assistance of counsel requiring a new sentencing hearing). The trial courts, vested with considerable discretion in evidentiary matters, must not neglect the due process implications involved in a capital defendant's right to present mitigation evidence.

8. In this case, the State repeatedly asked the trial court to order Mercer to disclose his experts and to require a written report from his experts. The trial court refused to order defense experts to produce written reports. *State v. Northcutt*, 372 S.C. 207, 216–17, 641 S.E.2d 873, 878 (2007) (holding that Rule 5, SCRCrimP, provides no basis for a trial court to require the creation of written defense expert reports for disclosure to the State). The trial court ultimately relented to the State's discovery requests by ordering the parties to meet and attempt to resolve the impasse. This was done, and because defense counsel failed to hit the bull's eye concerning Dr. Steedman's precise opinion regarding the SPECT Scan study, the State cried foul. The State's claim of unfair surprise is meritless.

length concerning Mercer's cognitive deficiencies. Dr. Steedman's unchallenged testimony included reference to the SPECT Scan results as "confirmatory" of Mercer's learning disorder. More to the point, the same evidence the State successfully and erroneously challenged—the SPECT Scan abnormality—was already in evidence without objection.

Another defense expert previously testified that the SPECT Scan revealed an abnormality. Dr. Donna Schwartz–Watts, a defense psychiatrist, testified that she "ordered what's called a SPECT Scan. And what a SPECT Scan is, this is one of the newer tests in medicine and it shows brain function. . . . But what it does, it's a . . . picture of how your brain functions, and that test came back abnormal. There's a . . . small area that's not normal on there. . . . " Later, as Dr. Schwartz–Watts began to sum up her testimony, she again talked about the SPECT Scan. Referring to Mercer, she said that "it's already a bad brain in the sense that he's got a learning disability and . . . we even know that on a SPECT Scan there's an abnormality." Thus, the very "SPECT Scan abnormality" testimony Mercer sought to admit through Dr. Steedman was presented to the jury without objection through Dr. Schwartz–Watts. We therefore find the trial court's error in excluding Dr. Steedman's opinion testimony was harmless beyond a reasonable doubt. *State v. Mitchell*, 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985) (quoting *State v. Key*, 256 S.C. 90, 93, 180 S.E.2d 888, 890 (1971)) (noting that an error is harmless when it " 'could not reasonably have affected the result of the trial' ").

B. Exclusion of Dr. Steedman's psychiatric opinion

■ As noted, Dr. Steedman is board certified in both neurology and psychiatry. When Mercer sought to elicit brief testimony from Dr. Steedman as a psychiatrist, the State objected, claiming Dr. Steedman was only disclosed as an expert in neurology. The basis of the State's objection arose from the nonexistent discovery order, discussed above. The trial court entertained the objection, and Mercer proceeded to make an offer of proof. The offer of proof of Dr. Steedman's psychiatric opinion comprises a mere half page in this voluminous record. The thrust of Dr. Steedman's psychiatric opinion was that the "types of [Mercer's] abnormalities . . . are a cumulative effect on poor judgment, depression, anxiety,

thought disorders, [and] paranoia." The State's objection was sustained, and Dr. Steedman was prevented from rendering a psychiatric opinion.

Although the basis of the State's objection was specious, no reversible error is present. The excluded evidence was presented to the jury through other witnesses, especially Dr. Schwartz–Watts, without objection. Even defense counsel acknowledged that the proffered psychiatric opinion testimony of Dr. Steedman "certainly . . . mirrors [and] dove-tail[s]" with Dr. Schwartz–Watts. As a result, Mercer sustained no prejudice from the exclusion of this cumulative evidence. *State v. Graham*, 314 S.C. 383, 386, 444 S.E.2d 525, 527 (1994) (noting that a harmless error analysis depends upon a host of factors, one of which is whether the excluded evidence was cumulative).

## VI.

### *Denial of Mercer's Post-trial Motions*

We finally address Mercer's two post-trial motions. These motions cannot be properly understood and evaluated in a vacuum, for they naturally flow from Mercer's efforts to create a reasonable doubt in the State's case by pointing to Marcus Thompson as the shooter.

The centerpiece of Mercer's guilt phase defense was third-party guilt—Thompson as the triggerman. As defense counsel asserted in the opening statement to the jury:

One of the key factors in this case was omitted [from the solicitor's opening remarks], and that is riding in the Lincoln Navigator was a second person. Ladies and Gentlemen that second person is not here today. We don't know where he is. Last time I heard he was out on bond. Last time I heard he wasn't even charged with murder or armed robbery. That wasn't how it started out. He was charged with all the same things that Kevin Mercer was.

. . . .

. . . Suffice it to say Marcus Thompson was in the Navigator and he's not here today, and we believe that Marcus Thompson, in fact, was the shooter. That's our theory. It's pretty simple.

This theme was pursued throughout the trial, as the defense sought to create a reasonable doubt that Mercer was the triggerman. This approach was directly linked to what Mercer characterized as a "tunnel vision" approach to the investigation. One example comes from the gloves taken from Thompson that were not tested for gunshot residue (GSR). Counsel for Mercer argued forcefully that the State's decision not to test the gloves for GSR demonstrated the State's myopic view to focus on Mercer at the expense of a thorough and proper investigation. The following excerpts from the closing argument illustrate this defense strategy:

> [The State does not] want to talk about Marcus Thompson.... You know, we had to dig and bring out the things about Marcus Thompson. They didn't want to show you any evidence about him. They wanted to ignore anything about him that would give you the full picture of what happened on May 16, 2002.... We had to pull it out of them.
>
> . . . .
>
> ... But do we know that it wasn't Marcus Thompson with gloves on that pulled that trigger in that dimly-lit parking lot?
>
> . . . .
>
> They didn't show you the gloves because it points directly to Marcus Thompson being the shooter.
>
> . . . .
>
> ... And we'd know ... if they had sent those gloves to the [State Law Enforcement Division] lab. We'd know if they were full of barium, antimony, and lead. We'd know that.
>
> . . . .
>
> ... Maybe Marcus Thompson with his gloves on shot Sergeant Davis and then went and got Kevin [Mercer]. It's up to the State to prove it, and they haven't done it.
>
> . . . .
>
> They chose to declare Kevin Mercer the shooter and ignore the other evidence, ignore the other possibilities, ignore Marcus Thompson and his gloves.

A. Denial of funding post-trial to test Thompson's gloves

 Mercer's post-trial motion for funds to test Thompson's gloves for GSR was denied. The matter of authorizing funds to capital defendants lies within the sound discretion of the trial court. S.C. Code Ann. § 16–3–26(C)(1) (2003) (authorizing the trial court to award funds where court determines requested funds are "reasonably necessary"); *see also State v. Matthews*, 291 S.C. 339, 345, 353 S.E.2d 444, 448 (1986) (holding that the decision to award funds to capital defendants is a matter within the trial court's discretion). Before trial, the trial court authorized $53,000 for Mercer's defense. The trial judge went further and invited defense counsel to request additional funds "if what I have authorized in this order is not going to get you all the way to trial." The record discloses no additional funding request prior to this post-trial motion.

Of particular significance to a proper resolution of this post-trial funding request is the fact that Mercer retained a GSR expert for trial. The expert, Jeffrey Hollifield, is a chemist, formerly employed with the South Carolina State Law Enforcement Division. Hollifield was assigned the limited task of analyzing the inconclusive results of the GSR test conducted on Mercer. For apparent strategic reasons, Hollifield was not tasked with testing the gloves found in Thompson's possession. As discussed above, the defense opted to challenge the adequacy of the State's investigation, pointing to the State's failure to test Thompson's gloves. Having elected not to test Thompson's gloves for trial purposes, there is no abuse of discretion in the denial of Mercer's post-trial motion for additional funding.

B. Denial of new trial motion based on after-discovered evidence

 Following the trial, and while the case was initially on appeal, Solicitor Myers received a letter from Kevin Fuller, who had been one of Thompson's cellmates at the Lexington County Detention Center. In a second letter to Solicitor Myers, Fuller asked for "help" and "some probation" with his pending charges. According to Fuller, Thompson had admitted to shooting the victim. Solicitor Myers promptly forwarded Fuller's letters to defense counsel, who filed a motion for a

new trial based on after-discovered evidence. Because this information came to light after the filing of the appeal, we remanded the matter to the trial court to conduct an evidentiary hearing. The trial court heard the matter fully and, in a detailed order, denied the new trial motion, both as to the guilt and sentencing phases. Mercer assigns error to the denial of his new trial motion.

■ The decision whether to grant a new trial rests within the sound discretion of the trial court, and this Court will not disturb the trial court's decision absent an abuse of discretion. *State v. Johnson*, 376 S.C. 8, 11, 654 S.E.2d 835, 836 (2007); *State v. Simmons*, 279 S.C. 165, 166, 303 S.E.2d 857, 858 (1983). Having carefully considered the new trial motion, fully cognizant of Mercer's third-party guilt defense, we find no abuse of discretion in the denial of his motion.

■ In order for Mercer to prevail in his new trial motion premised upon after-discovered evidence, he must show the after-discovered evidence: (1) is such that it would probably change the result if a new trial were granted; (2) has been discovered since the trial; (3) could not in the exercise of due diligence have been discovered prior to the trial; (4) is material; and (5) is not merely cumulative or impeaching. *State v. Spann*, 334 S.C. 618, 619–20, 513 S.E.2d 98, 99 (1999). The State concedes that all elements are met, save the first element.

■ In this post-trial setting, our jurisprudence recognizes the gatekeeping role of the trial court in making a credibility assessment.[9] *State v. Porter*, 269 S.C. 618, 621, 239 S.E.2d 641, 643 (1977) (noting that the determination of whether new evidence is credible for purposes of a new trial motion rests with the trial court); *State v. Deese*, 266 S.C. 534,

9. The analytical framework at play in this post-trial motion (imposing on the trial judge a gate-keeping role in making credibility determinations) stands in stark contrast to the admissibility of third-party guilt evidence at trial. Provided threshold admissibility is met, third-party guilt evidence may not be excluded based on the trial court's view of the evidence or the perceived "strength" of the State's case. *Holmes v. South Carolina*, 547 U.S. 319, 330–31, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (reversing the exclusion of evidence in a criminal trial and holding that the trial court may not exclude evidence of third-party guilt based upon a determination of the strength of the State's evidence).

538, 225 S.E.2d 175, 176 (1976) (noting that the trial court is tasked with assessing the new evidence in a motion for a new trial); *State v. Pierce,* 263 S.C. 23, 33, 207 S.E.2d 414, 419 (1974) (quoting *State v. Mayfield,* 235 S.C. 11, 34–35, 109 S.E.2d 716, 729 (1959)) ("The credibility of newly-discovered evidence offered in support of a motion for a new trial is a matter for determination by the circuit judge to whom it is offered. In him, not this court, resides the power to weigh such evidence; and his judgment thereabout will not be disturbed except for error of law or abuse of discretion."). On review, we may not make our own findings of fact. The deferential standard of review constrains us to affirm the trial court if reasonably supported by the evidence.

The after-discovered evidence is limited to Fuller's testimony that Thompson admitted to being the triggerman. Thompson's participation in, and first-hand knowledge of, the crime, was clearly known to Mercer and the State from the beginning. With the proper standard of review in mind, we review the trial court findings.

We begin with the trial court's conclusion concerning Fuller's testimony:

I carefully observed Fuller's demeanor and listened to his testimony. In my view, the inconsistencies in his own stories, the differences between his version and that of Thompson and Johnston, and the inconsistency of Fuller's story with known facts did not result from mistake or failure of recollection, but rather from intentional, calculated misrepresentations. I believe Fuller fabricated the story about Thompson admitting to shooting Sergeant Davis. I believe Fuller purposefully made different statements about this at different times when Fuller's view of what version of the story suited Fuller's interests best had changed. Finally, apart from the factors listed above, Fuller simply left me with the clear impression he was not telling the truth. Fuller's testimony has very little credibility.

Fuller's criminal record includes multiple convictions for burglary, aggravated assault and battery, and criminal domestic violence. Fuller characterized his criminal history as a "nice record." We recognize that all the key participants in the post-trial hearing have extensive criminal records.

More relevant to the inquiry is careful scrutiny of the actual statements Fuller attributes to Thompson. Given the inconsistencies with Fuller's story, there is a basis to sustain the trial court's lack of credibility finding. For example, on cross examination at the evidentiary hearing, Fuller gave varying versions as to when Thompson confessed to the murder. Concerning the substance of the various statements, when Fuller was confronted with the inconsistency "about what happened to the gun," he said he "miswrote" the initial statement because he "was in a hurry." [10] Another inconsistency is found in Fuller's account of where Davis was shot—as Davis was exiting his vehicle (which is Fuller's account) versus outside the vehicle.

Fuller informed investigators in a July 19, 2006, interview that another cellmate could corroborate Thompson's alleged confession. The other cellmate, Timothy Johnston, did testify, but he denied Fuller's account of the Thompson confession. The trial court found Johnston's testimony credible.

Fuller's credibility may be assessed not only by internal inconsistencies within his statements and testimony, but also by contrasting the purported Thompson confession against what are fairly solid facts. First, the only witness to the crime, Magwood, provided a physical description of the assailant, a description that closely matched the much bigger Mercer and not the slender Thompson. Second, Magwood saw Davis being forced, apparently at gunpoint, by the heavyset assailant toward the rear of the Navigator; Magwood found Davis lying in the bushes next to the parking lot. This is at odds with the Fuller account of the murder occurring in the area of the driver's door. Third, Fuller testified to a blood smear on the Navigator; the vehicle was stopped only minutes after the murder and no blood was found in or on the vehicle. Fourth, according to Fuller, Thompson shot Davis "pointblank ... behind his ear." The pathologist opined that, because of the absence of soot or stippling around the wound, the fatal shot came from a distance of "at least two feet away from the skin of the victim." Fifth, according to Fuller, Thompson

---

10. This inconsistency concerns Mercer's possession of the murder weapon immediately after the murder as he exited the apartment complex in Davis's Navigator.

moved the murder weapon during the traffic stop and placed it under Mercer's seat. This is at odds with the testimony of Deputy Stazer, who pulled the vehicle over and saw no such movement in the vehicle.

To be sure, Mercer may challenge the certitude of these so-called facts, but their cumulative effect informed the judgment of the trial court in assessing the post-trial motion based on after-discovered evidence.

Having thoughtfully considered the evidence, the trial court determined that "there is essentially no chance the jury would believe Fuller's testimony that Thompson confessed to shooting Sergeant Davis." This finding of course is beyond the applicable "would probably change the result" standard. *Spann*, 334 S.C. at 619, 513 S.E.2d at 99. In denying the post-trial motion as to the guilt phase, the trial court observed that the jury was charged, without objection, on the law of "the hand of one is the hand of all." In denying the post-trial motion as to the sentencing phase, the trial court observed that the jury was charged that it could recommend a death sentence only if it found that Mercer was the triggerman.[11]

▬ Mercer takes issue with the denial of his post-trial motion. Mercer posits a different view of the facts. Mercer, in essence, invites this Court to make different credibility determinations, especially with respect to Fuller. Beyond Fuller, it is argued that the trial court had a valid reason not to believe cellmate Johnston over Fuller, for Johnston was facing life imprisonment with a pending burglary first-degree charge.[12] We respectfully decline Mercer's invitation to en-

---

11. The trial court charged the jury:

 Now, you will recall that in the guilt phase of the trial I charged you on the concept of the hand of one is the hand of all. That concept does not apply in this penalty phase of the trial. . . . Before you may consider imposing the death penalty, you must first find that the State has proven beyond a reasonable doubt that the defendant, Kevin J. Mercer, fired the shot that killed the victim. If you find that the State has failed to prove that Kevin J. Mercer fired that shot, then you may not impose the death penalty but you must impose a life sentence.

12. As between Johnston and Fuller, the trial court recalled Johnston's testimony to the effect that "Fuller thought he could benefit from fabricating a story about Thompson shooting Sergeant Davis." While the record confirms that Fuller was seeking "help" with his charges,

gage in *de novo* fact finding. We further reject the suggestion to ignore the trial court's gatekeeping role in post-trial after-discovered evidence motions.

> The credibility of newly-discovered evidence offered in support of a motion for a new trial is a matter for determination by the circuit judge to whom it is offered. In him, not this court, resides the power to weigh such evidence; and his judgment thereabout will not be disturbed except for error of law or abuse of discretion.

*Mayfield*, 235 S.C. at 34–35, 109 S.E.2d at 729.

To accept Mercer's premise that a jury must weigh the conflicting evidence ignores the *State v. Spann* factors and the gatekeeping role of the trial court as outlined in many cases, including *State v. Mayfield*. Moreover, the approach advanced by Mercer confuses the applicable standard in post-trial after-discovered evidence motions with the admissibility of third-party guilt evidence at trial.

The question before us, then, is whether the trial court's denial of the post-trial motion amounts to an abuse of discretion. We hold it does not. In so ruling, we are sensitive to the notion that a mere finding of a witness's lack of credibility does not complete the analysis, because a witness may lack persuasive credibility and still create reasonable doubt. This sensitivity forms part of our consideration. We have drawn the line, however, with Mercer's desire to use Fuller's testimony for "residual doubt" as to guilt in the sentencing phase. *Franklin v. Lynaugh*, 487 U.S. 164, 172–74, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (clarifying Eighth Amendment jurisprudence by noting that a state is not constitutionally required to allow a capital defendant to submit "residual doubt" mitigation evidence in the sentencing phase of a capital case). We affirm the denial of Mercer's post-trial motion based on after-discovered evidence.

---

Johnston did not testify to any such "fabrication" admission by Fuller. Mercer is correct in challenging the trial court's erroneous finding in this regard. We view the error as insignificant. The strong findings of the trial court against Fuller's credibility cannot reasonably be said to be dependent on this one finding. This finding does not form a meaningful part of the trial court's order, for it stands alone in an otherwise coherent analysis.

## VII.

We have conducted the statutorily mandated review under S.C. Code Ann. § 16–3–25 (2003). We find the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. We further find that the evidence supports the jury's finding of a statutory aggravating circumstance, and that the sentence of death is proportionate to sentences imposed under similar situations. *State v. Huggins,* 336 S.C. 200, 519 S.E.2d 574 (1999); *State v. McWee,* 322 S.C. 387, 472 S.E.2d 235 (1996). Mercer's convictions and sentence of death are

**AFFIRMED.**

TOAL, C.J., WALLER, PLEICONES and BEATTY, JJ., concur.