# The Supreme Court of South Carolina

The State, Respondent,

v.

Timothy Ray Jones Jr., Appellant.

Appellate Case No. 2019-001008

_____

## ORDER

_____

After careful consideration of Appellant's petition for rehearing, the Court grants the petition for rehearing on Issue I, dispenses with further briefing, and substitutes the attached opinion for the opinion previously filed in this matter. The Court denies the petition for rehearing on Issues II through VI.

| | |
|---|---|
| s/ Donald W. Beatty | C.J. |
| s/ John W. Kittredge | J. |
| s/ John Cannon Few | J. |
| s/ George C. James, Jr. | J. |
| s/ Kaye G. Hearn | A.J. |

Columbia, South Carolina
July 19, 2023

# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Timothy Ray Jones Jr., Appellant.

Appellate Case No. 2019-001008

Appeal from Lexington County
Eugene C. Griffith Jr., Circuit Court Judge

Opinion No. 28145
Heard November 9, 2021 – Filed March 29, 2023
Re-Filed July 19, 2023

**AFFIRMED**

Chief Appellate Defender Robert Michael Dudek, Appellate Defender Susan Barber Hackett, Appellate Defender David Alexander, Appellate Defender Lara Mary Caudy, and Appellate Defender Taylor Davis Gilliam, all of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, and Assistant Attorney General Tommy Evans Jr., all of Columbia, and Solicitor Samuel R. Hubbard III, of Lexington, for Respondent.

**JUSTICE JAMES:** Appellant Timothy Ray Jones Jr. admitted to killing his five young children and was indicted for five counts of murder. He was convicted by jury and sentenced to death. In this direct appeal, Jones raises eight issues centering on three points: juror qualification, requested voir dire and a related jury instruction, and evidentiary rulings made during the guilt and sentencing phases. We affirm the juror qualification, voir dire, and jury instruction rulings. We hold the trial court erred in certain evidentiary rulings; however, we hold the errors were harmless and affirm Jones's conviction and death sentence.

### Background

This background summarizes the details surrounding the murders and Jones's actions in the succeeding days.

Jones and his wife were divorced and had five children. They had an informal joint custody agreement, with Jones being the children's primary caretaker. Throughout the day of August 28, 2014, Jones smoked spice—a form of synthetic marijuana—at work to cope with the stress of an impending project. Jones left work in the late afternoon and went to his home in Lexington County. He smoked more spice before leaving home to pick up his children. Abigail (age 1) and Gabriel (age 2) were staying at a neighbor's house, and Nahtahn (age 6), Elias (age 7), and Merah (age 8) were participating in an after-school program. Jones retrieved the children and purchased takeout from a local restaurant.

After Jones and the children returned home with their supper, Jones discovered an electrical outlet in the house was not working. He accused Nahtahn of tampering with the outlet because Nahtahn had an unusual interest in electricity. To get Nahtahn to admit he played with the outlet, Jones forced Nahtahn to do one hundred pushups, one hundred situps, and two hundred squats, all in sets of ten.

Nahtahn never admitted to playing with the outlet, but Jones later heard Nahtahn telling his mother over the phone, "It was an accident, Mommy." Enraged, Jones sent Nahtahn to bed. Later that night, Jones went to check on Nahtahn. He shook Nahtahn by the shoulders and again demanded to know what happened to the outlet. Nahtahn collapsed to the floor. Jones told Elias and Merah he thought Nahtahn was dead, and Merah confirmed Nahtahn was not breathing.

Jones then searched the internet for a violent male-on-male rape scene from the movie *American History X* and began to fear the things he would endure in prison as a "baby killer." At approximately 2:00 a.m., Jones took Merah with him to purchase ten packs of cigarettes at a nearby convenience store. Jones claimed that

on the way home, he heard voices in his head telling him to kill his other four children because they would be better off in Heaven than without parents.

When Jones and Merah returned home, Merah went to bed. Jones smoked two bowls of spice and walked to the living room where Elias and Merah were sleeping. Jones wrapped his hands around Elias' neck and strangled him to death while Elias begged, "Dad, take me with you." Jones then turned toward Merah, who pleaded, "Daddy, I love you," and strangled her to death. Jones proceeded to strangle Abigail and Gabriel to death using a belt because his hands were too big to wrap around their tiny necks.

Jones next tried to kill himself by smoking seven or eight more bowls of spice. He woke up the following day and became paranoid. Thinking it was a matter of time before he was arrested, Jones decided he would go to Las Vegas. He wrapped each of the five bodies in bedsheets and stacked them in the back seat of his Cadillac Escalade. For the next eight days, Jones kept the bodies in his vehicle and drove back and forth through South Carolina, Georgia, Alabama, and Mississippi. At various points along the way, Jones purchased spice, trash bags, chemicals, goggles, a dust mask, and a jab saw.[1] During the trip, he searched online for applicable extradition laws and local dumpsites, landfills, and campgrounds.

On September 6—eight days after the murders—Jones placed his children's bodies in trash bags and dumped them in a rural area near Pine Apple, Alabama. Later that day, Jones was stopped at a safety checkpoint in Smith County, Mississippi. Officer Charles Johnson testified that as Jones approached the checkpoint, he smelled a strong odor of burnt marijuana and garbage coming from the vehicle. Officer Johnson noticed Jones's eyes were red and glassy and his speech was slurred. Officer Johnson asked Jones to pull to the side of the road. Jones consented to a search of his vehicle, which revealed bleach stains on the floorboard; synthetic marijuana; drug paraphernalia; bleach; muriatic acid; charcoal fluid; and a scribbled note reading in part, "Head to campground," "Melt bodies," "Sand to dust or small pieces," and "Day 1: Burn up bodies. Day 2: Sand down bones. Day 3: Mexican Border☺, dissolve, and discard." Jones was arrested for driving under the influence, possession of a controlled substance, and possession of drug paraphernalia. A dispatcher advised the officers of a hit on Jones's vehicle for five missing children. Jones confessed to the murders soon after his arrest, and on September 9—eleven days after the murders—Jones led law enforcement to his

---

[1] A jab saw is a long, narrow saw typically used to cut building material.

children's bodies. The bodies were still in trash bags, and the children were unrecognizable due to severe decomposition and animal activity.

Jones was extradited from Mississippi to South Carolina, where he was indicted for five counts of murder. The State sought the death penalty, claiming the following aggravating circumstances applied: (1) the murder of two or more persons by one act or pursuant to one scheme or course of conduct and (2) the murder of a child eleven years of age or under. S.C. Code Ann. § 16-3-20(C)(a)(9)-(10) (2015). Jones entered a plea of not guilty by reason of insanity (NGRI) pursuant to South Carolina Code subsection 17-24-10(A) (2014).[2] The jury rejected the insanity defense, returned five guilty verdicts, and recommended a death sentence. The trial court adopted the jury's recommendation and sentenced Jones to death. Jones raises the following issues in this direct appeal:

(1) Did the trial court err in qualifying Juror #156?

(2) Did the trial court err in disqualifying Juror #338?

(3) Did the trial court err in denying Jones's request for voir dire and a jury instruction detailing the consequences of an NGRI verdict?

(4) Did the trial court err in denying Jones's motion to suppress evidence obtained as a result of the safety checkpoint?

(5) Did the trial court err in excluding Dr. Adriana Flores' expert testimony during the sentencing phase?

(6) Did the trial court err in limiting testimony pertaining to Jones's future dangerousness, remorse, and social history during the sentencing phase?

---

[2] Subsection 17-24-10(A) sets forth the affirmative defense of insanity:

It is an affirmative defense to a prosecution for a crime that, at the time of the commission of the act constituting the offense, the defendant, as a result of mental disease or defect, lacked the capacity to distinguish moral or legal right from moral or legal wrong or to recognize the particular act charged as morally or legally wrong.

A defendant has the burden of proving insanity by a preponderance of the evidence. S.C. Code Ann. § 17-24-10(B).

(7) Did the trial court err in excluding Cynthia Turner's pre-recorded testimony during the sentencing phase?

(8) Did the trial court err in admitting autopsy photographs of the child victims during the sentencing phase?

## Discussion

### A. Guilt Phase

#### 1. Qualification of Juror #156

The determination of whether a prospective juror is qualified to serve on a capital trial jury is "within the sole discretion of the trial judge and is not reversible on appeal unless wholly unsupported by the evidence." *State v. Evins*, 373 S.C. 404, 418, 645 S.E.2d 904, 911 (2007). When reviewing an alleged error in the qualification of a juror, we conduct a three-step analysis, giving particular deference to the trial judge who sees and hears the juror. *State v. Green*, 301 S.C. 347, 352, 392 S.E.2d 157, 159-60 (1990); *Evins*, 373 S.C. at 418, 645 S.E.2d at 911. First, we must find the appellant exhausted all of his peremptory challenges. Second, we must determine the disputed juror was erroneously qualified. Third, we must conclude the erroneous qualification deprived the appellant of a fair trial.

We have repeatedly held that to determine whether a juror was erroneously qualified, the challenged juror's responses must be examined "in light of the entire *voir dire*." *Evins*, 373 S.C. at 418, 645 S.E.2d at 911; *Green*, 301 S.C. at 354, 392 S.E.2d at 161; *State v. Woods*, 382 S.C. 153, 159, 676 S.E.2d 128, 131 (2009). A juror is erroneously qualified when "his or her views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Woods*, 382 S.C. at 159, 676 S.E.2d at 131; *see Wainwright v. Witt*, 469 U.S. 412, 424 (1985); S.C. Code Ann. § 16-3-20(E). "The ultimate consideration is that the juror be unbiased, impartial, and able to carry out the law as explained to him." *State v. Sapp*, 366 S.C. 283, 291, 621 S.E.2d 883, 887 (2005).

Jones exhausted all ten of his peremptory challenges before Juror #156 was seated, thus satisfying step one of our analysis. Step two—whether the trial court erroneously qualified Juror #156—is the crux of Jones's challenge. Jones argues Juror #156 was erroneously qualified because (1) he was unwilling to consider social history evidence that did not involve the facts or circumstances surrounding the murders and (2) he could not consider voting for a life sentence on the basis of mercy. We disagree.

During voir dire, the trial judge questioned whether Juror #156 could consider the facts of Jones's case in an unbiased manner.  Juror #156 told the trial judge, "I believe that all the evidence and the facts should be presented and taken into consideration when you are talking about somebody's life[,] especially what this case deals with."

Moments later, the trial judge asked Juror #156 to identify himself as one of three types of capital jurors: Type 1 jurors, who believe the death penalty is appropriate when a defendant is convicted beyond a reasonable doubt of aggravated murder; Type 2 jurors, who believe life without parole is appropriate when a defendant is convicted beyond a reasonable doubt of aggravated murder; and Type 3 jurors, who believe the death penalty or life without parole may be appropriate when a defendant is convicted beyond a reasonable doubt of aggravated murder.  Juror #156 replied, "I find myself torn between, I see myself as type three but depending on the facts I can quickly bring myself to type one, depending on the facts and evidence."  Throughout his testimony, Juror #156 continually emphasized he could meaningfully consider the testimony and evidence presented in light of the trial court's instructions and the four verdict forms, all while being fair and impartial to both sides.

When the trial judge questioned Juror #156 about the sentencing phase of trial, Juror #156 said he understood the death penalty is not automatic and reiterated, "I believe you have to take [into] consideration all evidence when you are talking about somebody's life."  Juror #156 continued, "If the evidence . . . calls for the death penalty then I feel like as human beings we have to determine whether . . . to take . . . that person's choice to live or not."  Finally, Juror #156 told the trial judge he could recommend either the death penalty or life without parole depending on the facts presented.

During the State's examination, the solicitor asked Juror #156,

So if you were to sit on a jury . . . and [reach] with your colleagues, your co-jurors, the decision he is guilty of murder, . . . . [w]ould you already have your mind made up coming in that second phase or would you want to hear additional stuff of the good and the bad, the aggravating and the mitigating, before you made that big decision?

Again, Juror #156 reiterated:

> Every ounce of information, evidence, facts, mitigation, everything, needs to be taken into consideration before the final decision . . . . If the evidence at the end of all of this, mitigation, aggravation, all of that, if it constitutes for the death penalty then what is right is right, what is wrong is wrong.

At the conclusion of the State's examination, Juror #156 told the solicitor he had not made up his mind; instead, he wanted to hear all of the facts before making a final decision.

During defense counsel's examination, Juror #156 explained he wanted to hear everything—the defendant's good, bad, past, and future—before coming to a sentencing decision. Juror #156 stated he understood and respected that jurors have the right to decline imposing the death penalty solely based on mercy, but he also expressed his belief that based on the facts presented, jurors should be able to explain why they made a particular sentencing decision. Defense counsel then asked, "Somebody might say, I can't explain it to you, this is what I feel is right. . . . Can you respect a juror's right to say, I don't have a reason, this is my moral judgment, this is what is right for me, I have got to do it?" Juror #156 replied, "It might sound harsh when I say this. But if they say that after being presented the facts, I don't believe they should be here." Soon after, Juror #156 stated,

> I think after you are presented the evidence and the facts, you have a reason of the way you feel and . . . the decision you make. . . . I don't see how you can be here and be fair to both parties if some[one] says, well, I feel merciful. What is right is right and what is wrong is wrong.

During the State's final examination, the solicitor questioned whether Juror #156 could consider mitigating factors before recommending a sentence. Juror #156 responded,

> I am thinking, it needs to be within a reason timetable . . . . But when we are here for . . . the murders of these kids, [it] needs to be involved around this. . . . The mitigating factors that have something to do with the case. But also, I mean, when you are talking about somebody's life, . . . . there is nothing wrong to me with getting all the facts, all the evidence.

The solicitor then asked whether Juror #156 could consider mitigation evidence presented by the defense that went "way back." Juror #156, again emphasizing the facts, stated,

> Yes, I don't see why it could do any wrong. But, like I said, for me personally, you know, what happened twenty years ago when you are in elementary school doesn't have anything to do with your decision making now. . . . But like I said, I will be willing to, I mean when you are talking about somebody's life, like I said, if the Defense wants to give up their facts, the Prosecutors want[] to give their facts, I am willing to listen to both before making an ultimate decision.

Finally, the solicitor asked whether the ultimate sentence Juror #156 recommended "would depend on facts or just feelings." Juror #156 responded, "Facts."

After Juror #156 left the courtroom, Jones moved to excuse him as being "substantially impaired in his ability to follow the law." Essentially, Jones argued Juror #156 was (1) mitigation-impaired in that he could only consider mitigation evidence within a recent timetable and (2) unable to respect the rights of other jurors to decline imposing the death penalty based on mercy alone. The State responded that Juror #156 was a "facts guy" who was willing to listen to all mitigation evidence even though he had a difficult time understanding how distant evidence could relate to a present crime. Based on the totality of Juror #156's testimony, including him stating "repeatedly he wanted to hear all the facts . . . before mak[ing] a huge decision of taking someone's life," the trial court qualified Juror #156. Jones objected under the Sixth and Fourteenth Amendments, again claiming Juror #156 was mitigation-impaired and unable to consider mercy. We agree with the trial court's qualification.

Juror #156 repeatedly stressed throughout voir dire the importance of facts. He never indicated he would automatically impose the death penalty and instead stated his sentencing recommendation would be wholly determined by the evidence set forth at trial. When asked questions regarding preconceived notions about the death penalty, Juror #156 reiterated, "I go back to the evidence." Although Juror #156 initially expressed doubt about how mitigation evidence from a defendant's childhood could affect the defendant's present decision-making, he completed his response with, "but like I said, . . . . I am willing to listen to both [sides] before making an ultimate decision."

Juror #156 never rejected the possibility of a "mercy sentence." Rather, Juror #156 stated his belief that even if a mercy sentence was imposed, a juror should be

able to articulate why he or she chose mercy. Jones improperly isolates Juror #156's statement, "I don't see how you can be here and be fair to both parties if some[one] says, well, I feel merciful." That statement must be considered in light of Juror #156's entire voir dire, including his preceding statement, "I think after you are presented the evidence and the facts, you have a reason of the way you feel and . . . the decision you make." Together, these responses reflect Juror #156's desire for jurors to specify the reason for their decisions, but they do not insinuate Juror #156 was unable to impose a life sentence based on mercy alone. For these reasons, we affirm the trial court's qualification of Juror #156.

## 2. Disqualification of Juror #338

"On review, the trial court's disqualification of a prospective juror will not be disturbed where there is a reasonable basis from which the trial court could have concluded that the juror would not have been able to faithfully discharge his responsibilities as a juror under the law." *Green*, 301 S.C. at 355, 392 S.E.2d at 161; *see State v. Wise*, 359 S.C. 14, 23-24, 569 S.E.2d 475, 479 (2004). We must be particularly deferential to the trial judge who sees and hears the juror, keeping in mind that in certain situations, the trial judge may disqualify a juror based on a "definite impression" that he or she would be unable to return a verdict according to law. *Evins*, 373 S.C. at 418, 645 S.E.2d at 911; *see* S.C. Code Ann. § 16-3-20(E).

When defense counsel examined Juror #338, he questioned whether Juror #338 could fairly consider an NGRI verdict. Particularly, defense counsel inquired, "If in your mind you thought [expert witnesses] present[ed] enough information to support that verdict, is that a verdict you could really consider or would you still have some hesitation because it would kind of be letting someone off still?" Juror #338 responded, "It would depend on the information provided and the plan of action after that. So obviously you, claimed insanity, you wouldn't just become part of society again. What would then be that plan[?] So you have been declared insane and then what, now what, essentially." Around this time, the State objected and Juror #338 was briefly excused from the courtroom.

After discussing this line of questioning, the trial judge ruled defense counsel could ask Juror #338, "Not knowing what would happen, would that cause you to perhaps not consider [an NGRI] verdict?" Juror #338 answered, "I would need to know what happened to consider that verdict." Soon after, the State objected again. The trial judge clarified, "The end result plan is not allowed to be given in a trial. Okay. It is not. So he is asking you, if that were the case then would that affect your ability to consider [an NGRI verdict]." The following exchange took place:

**Juror #338:**  Can I ask a question?

**The Court:**  You may.

**Juror #338:**  So in the case of the death penalty, you know death is the result.

**The Court:**  That is the result.

**Juror #338:**  And if you know the life sentence without parole, you know that is a result.

**The Court:**  Correct.

**Juror #338:**  But in the case of not guilty by insanity, you don't know the result.

**The Court:**  Don't know the result.

**Juror #338:**  I don't understand.

**The Court:**  That is just the Court rules.  So the result of that you would always be in the dark with regard to the result of a not guilty by reason of insanity verdict.  Knowing you would always be in the dark about that, not knowing what would happen, would that cause you to maybe not consider that verdict as a true verdict.  <u>Would you vote for it not knowing what would happen?</u>

**Juror #338:**  <u>I have no words honestly because without knowing what the result is how can you choose that option.</u>

**The Court:**  So it sounds like you do have some reservations about choosing that option, not knowing the result.

**Juror #338:**  It is just not knowing the result.  You know the result of the other options but you don't know the result of that option.

**The Court:**  Okay.  She has answered that sufficiently.  Move on.

(emphasis added).

At the conclusion of voir dire, the State argued Juror #338 was unqualified because she would have unanswered questions about the consequences of an NGRI verdict.  In response, defense counsel contended that although Juror #338 expressed

concern and confusion about not knowing the consequences of an NGRI verdict, she did not express a complete inability to consider that verdict. Ultimately, the trial judge excused Juror #338, noting: "Since I can't answer your question and that is a big concern of you being able to go forward and make a decision I am going to excuse you from jury service . . . ." Defense counsel objected, asserting that "just having concerns doesn't disqualify somebody." We agree with the trial court's ruling.

Jones argues Juror #338 should have been qualified because her responses indicated she could meaningfully consider an NGRI verdict. In Jones's view, Juror #338 was simply "concern[ed] about not knowing the outcome of such a verdict" and "confus[ed] as to why jurors were told the outcome of the two potential verdicts during the penalty phase . . . but not the outcome of a[n] NGRI verdict." Jones alleges Juror #338 "never indicated she would be unwilling to return a verdict of not guilty by reason of insanity . . . ."

Much like the juror's responses in *Sapp*, 366 S.C. at 291-92, 621 S.E.2d at 887, Juror #338's responses reflected her complete inability to render a verdict according to law. When asked if she could consider an NGRI verdict without knowing its consequences, Juror #338 unequivocally stated, "I would need to know what happened to consider that verdict." Thereafter, she expressed confusion as to why the jury was informed of the consequences of a guilty verdict (i.e., life without parole or death) but not informed of the consequences of an NGRI verdict. The trial judge explained he was bound by court rules, which do not permit such an instruction, and then asked Juror #338 whether she could consider an NGRI verdict knowing she would be in the dark as to its consequences. Juror #338 again stated she could not.

As we discuss immediately below, state and federal law do not require a juror to be informed of the consequences of an NGRI verdict during the guilt phase of a capital trial. To discharge her responsibilities as a juror, Juror #338 must have been able to fully consider each of the verdicts before her and decide upon a verdict in accordance with the law. Because Juror #338 unambiguously stated she could not consider an NGRI verdict unless she was informed of its consequences and because the trial court is forbidden from informing the jury of those consequences, we affirm the disqualification of Juror #338.

### 3. Denial of Jones's Request for Voir Dire and a Jury Instruction Detailing the Consequences of an NGRI Verdict

The trial court denied Jones's request for voir dire and a jury instruction detailing the consequences of an NGRI verdict. We affirm the trial court's ruling on this issue.

In *State v. Poindexter*, the defendant was charged with murder. 314 S.C. 490, 491, 431 S.E.2d 254, 254 (1993). Potential verdicts in the case were guilty, not guilty, NGRI, and guilty but mentally ill. The jury found the defendant guilty but mentally ill. The defendant appealed, arguing the trial court erred in refusing to inform the jury of the consequences of each verdict either during voir dire, opening statements, closing arguments, or special instructions. We affirmed the trial court's ruling, noting:

> [*V*]*oir dire* is not to be used as a means of pre-educating or indoctrinating a jury or as a means of impaneling a jury with particular predispositions. In our view, the discovery and elimination of biased or prejudiced jurors during *voir dire* does not require that they first be informed of the consequences of each potential verdict.

*Id.* at 492 n.2, 431 S.E.2d at 255 n.2 (citation omitted).

With respect to jury instructions <u>after</u> a jury is seated and sworn, the trial judge shall instruct the jury on the "current and correct law." *State v. Taylor*, 356 S.C. 227, 231, 589 S.E.2d 1, 3 (2003). "To warrant reversal, a trial judge's charge must be both erroneous and prejudicial." *Id.*

On several occasions, this Court has considered whether South Carolina law requires jurors to be instructed on the consequences of an NGRI verdict. We have held that in noncapital trials, absent agreement by the parties, a consequences instruction is improper unless it would be curative under the facts of a particular trial or it is required to clarify a misstatement of law and would not prejudice either party. *See State v. Huiett*, 271 S.C. 205, 208, 246 S.E.2d 862, 864 (1978). The justification for this rule is that in a noncapital trial, the jury has no sentencing responsibility and sentencing is irrelevant to the determination of guilt. *Poindexter*, 314 S.C. at 492, 431 S.E.2d at 255; *see State v. Pulley*, 216 S.C. 552, 555, 59 S.E.2d 155, 157 (1950); *State v. Valenti*, 265 S.C. 380, 388, 218 S.E.2d 726, 729 (1975); *State v. McGee*, 268 S.C. 618, 620-21, 235 S.E.2d 715, 716 (1977). In a capital trial, which is uniquely bifurcated, the same rule applies but for different reasons: (1) NGRI is a verdict during the guilt phase, not the sentencing phase, and (2) if an NGRI verdict is rendered, the jury has no sentencing responsibilities. *See State v. Bell*, 293 S.C. 391,

399, 360 S.E.2d 706, 710 (1987).  Although we acknowledge there is a trend toward requiring a consequences instruction,[3] we decline to join that trend.

Jones alternatively argues the trial court's denial of his request violated the Due Process Clause and the Eighth Amendment of the United States Constitution. We disagree.

In support of his due process argument, Jones cites *Simmons v. South Carolina*, 512 U.S. 154 (1994), *Shafer v. South Carolina*, 532 U.S. 36 (2001), and *Kelly v. South Carolina*, 534 U.S. 246 (2002), all of which deal with an instruction on parole ineligibility, not an instruction on the consequences of an NGRI verdict. Jones emphasizes that like *Simmons*, *Shafer*, and *Kelly*, this case involves a capital trial.  However, those cases are distinguishable because they deal with a jury instruction during the sentencing phase, not the guilt phase.

As explained above, capital trials are uniquely bifurcated.  *See* S.C. Code Ann. § 16-3-20(B).  Because a capital jury has sentencing responsibility in the sentencing phase, it makes sense that in certain situations, the Due Process Clause requires the

---

[3] Some states require the instruction notwithstanding objection or request.  *See* Alaska Stat. Ann. § 12.47.040(c) (West 2022); *People v. Tally*, 7 P.3d 172, 184 (Colo. App. 1999); *Roberts v. State*, 335 So. 2d 285, 288-89 (Fla. 1976); Ga. Code Ann. § 17-7-131(b)(3)(A) (West 2022); Kan. Stat. Ann. § 22-3428(f) (West 2022); *Kuk v. State*, 392 P.2d 630, 634-35 (Nev. 1964); *State v. Blair*, 732 A.2d 448, 451 (N.H. 1999); *State v. Krol*, 344 A.2d 289, 304-05 (N.J. 1975); N.Y. Crim. Proc. Law § 300.10(3) (McKinney 2023); *Commonwealth v. Mulgrew*, 380 A.2d 349, 351 (Pa. 1977); Tenn. Code Ann. § 33-7-303(e) (West 2023); *State v. Nuckolls*, 273 S.E.2d 87, 90 (W. Va. 1980).  One state requires the instruction "unless the defendant affirmatively objects[.]"  Conn. Gen. Stat. Ann. § 54-89a (West 2023).  Other states require the instruction only upon request.  Haw. Rev. Stat. Ann. § 704-402(2) (West 2022) (required when requested by the defendant); *Georgopulos v. State*, 735 N.E.2d 1138, 1143 (Ind. 2000) (same); *Commonwealth v. Chappell*, 40 N.E.3d 1031, 1042-43 (Mass. 2015) (same); *Erdman v. State*, 553 A.2d 244, 249-50 (Md. 1989) (same); Mo. Ann. Stat. § 552.030(6) (West 2022) (same); *State v. Hammonds*, 224 S.E.2d 595, 604 (N.C. 1976) (same); *State v. Shickles*, 760 P.2d 291, 297-98 (Utah 1988) (same), *abrogated on other grounds by State v. Doporto*, 935 P.2d 484 (Utah 1997); *People v. Dennis*, 215 Cal. Rptr. 750, 753 (Cal. Ct. App. 1985) (requiring an instruction when requested by the jury or the defendant); *State v. Leeming*, 612 So. 2d 308, 315 (La. Ct. App. 1992) (same); Ky. RCr 9.55 (requiring an instruction when requested by either party).

trial court to instruct the jury on the effects of a potential sentence.[4]  In the guilt phase, however, a capital jury has no sentencing responsibility; the jury's sole function is determining the guilt or innocence of the defendant.  *See Bell*, 293 S.C. at 399, 360 S.E.2d at 710.  The mere possibility of a particular verdict cannot support a consequences instruction when there is no guarantee the jury will proceed to sentencing in the first instance.  Therefore, we reject Jones's due process argument.

Jones next argues the heightened reliability requirement of the Eighth Amendment requires capital jurors to be informed of the consequences of an NGRI verdict, particularly where the defendant is mentally ill or less culpable due to his mental state.  *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (explaining the heightened need for reliability in capital trials as compared to noncapital trials).  To support his argument, Jones cites three federal cases prohibiting the execution of a mentally ill defendant.  *See Ford v. Wainwright*, 477 U.S. 399, 410 (1986); *Atkins v. Virginia*, 536 U.S. 304, 320-21 (2002); *Hall v. Florida*, 572 U.S. 701, 709 (2014).  However, Jones overlooks the fact that in this case, the jury expressly found he was neither mentally ill nor insane.  For this reason, we reject his Eighth Amendment argument.

## 1.  Denial of Jones's Motion to Suppress

Quite by chance, on the same day Jones disposed of the children's bodies, he was apprehended at a safety checkpoint in Smith County, Mississippi.  Deputy Charles Johnson, one of the two officers conducting the checkpoint, testified that "because things were quiet" on the night of September 6, 2014, he and Deputy Robert Thompson asked Smith County Under-Sheriff Marty Patterson for permission to conduct a safety checkpoint.  Sheriff Charlie Crumpton testified safety checkpoints were intended to check for driver's licenses, seatbelt violations, proper child restraints, and proof of insurance.  Sheriff Crumpton estimated approximately ten percent of drivers are ticketed or arrested at safety checkpoints.  He also testified the department's verbal policy required that checkpoints be approved by a supervisor

---

[4] *See, e.g.*, *Simmons*, 512 U.S. at 163 ("[W]here the jury has sentencing responsibilities in a capital trial, many issues that are irrelevant to the guilt-innocence determination step into the foreground and require consideration at the sentencing phase."); *Shafer*, 532 U.S. at 51 ("[W]hen the jury determines the existence of a statutory aggravator, a tightly circumscribed factual inquiry, none of *Simmons*' due process concerns arise. . . . It is only when the jury endeavors the moral judgment whether to impose the death penalty that parole ineligibility may become critical.  Correspondingly, it is only at that stage that *Simmons* comes into play[.]"); *Kelly*, 534 U.S. at 251-52 (reiterating *Simmons* and *Shafer*).

and conducted at a safe location by two or more officers who wear reflective vests and stop all vehicles. Deputy Johnson testified he and Deputy Thompson followed the department's policy. Deputy Johnson further testified he was normally equipped with a portable device to conduct breathalyzer tests on suspected drunk drivers.

Jones moved to suppress all evidence stemming from the Smith County checkpoint, arguing the checkpoint violated the Fourth Amendment because its primary purpose was general crime prevention. The trial court denied Jones's motion, and he contends the denial was improper. We disagree.

"[A]ppellate review of a motion to suppress based on the Fourth Amendment involves a two-step analysis. This dual inquiry means we review the trial court's factual findings for any evidentiary support, but the ultimate legal conclusion . . . is a question of law subject to de novo review." *State v. Frasier*, 437 S.C. 625, 633-34, 879 S.E.2d 762, 766 (2022).

The United States Supreme Court has considered the constitutionality of checkpoints on several occasions. The Supreme Court has unequivocally held checkpoints constitute Fourth Amendment seizures, even though their purpose is limited and the time of detention is brief. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556 (1976).

In *Delaware v. Prouse*, the Supreme Court considered the constitutionality of random spot checks designed to verify driver's licenses and vehicle registration. 440 U.S. 648, 650 (1979). The issue in *Prouse* arose when an officer on routine patrol decided to randomly stop a vehicle despite observing no traffic or equipment violations. The officer was not acting under law enforcement guidelines or procedures pertaining to spot checks. The Supreme Court noted there was no empirical data suggesting spot checks produced anything more than a marginal contribution to highway safety. Balancing "the State's interest in discretionary spot checks" and the "resulting intrusion on the privacy and security of the persons detained[,]" the Supreme Court held the "incremental contribution to highway safety" ensured by a random spot check is insufficient to justify a warrantless seizure under the Fourth Amendment. *Id.* at 655, 659. The Supreme Court clarified, however, that its holding did not prohibit states "from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion." *Id.* at 663. Critically, the Supreme Court suggested "[q]uestioning of all oncoming traffic at roadblock-type stops is one possible alternative." *Id.*

In *Michigan Department of State Police v. Sitz*, the Supreme Court considered the constitutionality of highway sobriety checkpoints. 496 U.S. 444, 447 (1990).

The law enforcement policy in *Sitz* required all vehicles to be stopped at sobriety checkpoints; if an officer suspected intoxication, he was required to direct the driver to pull over and produce a driver's license and vehicle registration. Data showed that during the challenged checkpoint, two out of 126 drivers (1.6%) were arrested for drunken driving. The Supreme Court distinguished *Prouse*, noting that "[u]nlike *Prouse*, this case involves neither a complete absence of empirical data nor a challenge to random highway stops." *Id.* at 454. Balancing "the State's interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped," the *Sitz* Court held mandatory sobriety checkpoints survive Fourth Amendment scrutiny. *Id.* at 455.

In *City of Indianapolis v. Edmond*, the Supreme Court addressed "the constitutionality of a highway checkpoint program whose primary purpose [wa]s the discovery and interdiction of illegal narcotics." 531 U.S. 32, 34 (2000). The Supreme Court observed the stops in *Sitz* and *Prouse* were concerned with highway safety, which is a significant Fourth Amendment interest. However, because the primary purpose of the *Edmond* program was not to ensure highway safety but instead "to uncover evidence of ordinary criminal wrongdoing," the Supreme Court held the program violated the Fourth Amendment. *Id.* at 41-42. Importantly, the Supreme Court repeated the suggestion it made in *Prouse* that "a similar type of roadblock with the purpose of verifying drivers' licenses and vehicle registrations would be permissible." *Id.* at 37-38.

Here, the checkpoint was precisely the type of checkpoint suggested by the Supreme Court in *Prouse* and *Edmond*. The State presented evidence sufficient to prove the primary purpose of the Smith County checkpoint was highway safety, not general crime prevention. Four officers testified the checkpoint was intended to check for driver's licenses, vehicle registrations, and proof of insurance. At no point did any witness suggest a contrary purpose. As in *Sitz*, the Smith County Sheriff's Department had a policy requiring that <u>all</u> vehicles passing through checkpoints be stopped in a safe, structured manner. Officers did not have unbridled discretion as was the case in *Prouse*; instead, stops were brief and minimally intrusive. For these reasons, we hold the trial court did not err in denying Jones's motion to suppress.

## B. Sentencing Phase

### 1. Exclusion of Dr. Adriana Flores' Expert Testimony

The South Carolina Code provides jurors must consider several mitigating circumstances in a capital trial, including whether "[t]he murder was committed while the defendant was under the influence of mental or emotional disturbance"; whether "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired"; and "[t]he age or mentality of the defendant at the time of the crime." S.C. Code Ann. § 16-3-20(C)(b)(2), (6)-(7). Additionally, the Eighth Amendment, which applies to the states through the Fourteenth Amendment, "requires that the jury [in a capital case] be able to consider and give effect to all relevant mitigating evidence offered by [the defendant]." *Boyde v. California*, 494 U.S. 370, 377-78 (1990); *see Lockett v. Ohio*, 438 U.S. 586, 604 (1978). This is particularly due to the "qualitative difference" between ordinary criminal trials and capital trials—where there is a "corresponding difference in the need for reliability . . . ." *Woodson*, 428 U.S. at 305.

"Generally, the admission of expert testimony is a matter within the sound discretion of the trial court." *State v. Whaley*, 305 S.C. 138, 143, 406 S.E.2d 369, 372 (1991). We will not reverse the trial court's exclusion of expert testimony unless the exclusion resulted from a prejudicial abuse of discretion. *State v. Cope*, 405 S.C. 317, 343-44, 748 S.E.2d 194, 208 (2013). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *State v. Kromah*, 401 S.C. 340, 349, 737 S.E.2d 490, 495 (2013) (quoting *State v. Douglas*, 369 S.C. 424, 429-30, 632 S.E.2d 845, 848 (2006)).

During the guilt phase of trial, Jones presented testimony from several experts in an attempt to establish his NGRI defense. Their testimony is summarized below. In reply, the State called neuropsychologist[5] Dr. Kimberly Kruse. Because the testimony from Jones's insanity witnesses and Dr. Kruse was also relevant to the foregoing statutory mitigation circumstances, it was incorporated into the sentencing phase.

Dr. Kruse testified she was asked by Dr. Richard Frierson, the court-appointed evaluator, to evaluate Jones. Dr. Kruse interviewed Jones on February 19, 2019, approximately two months before trial. Dr. Kruse testified about several tests she

---

[5] Neuropsychology focuses on understanding the relationship between one's brain and behavior.

administered during the evaluation and explained how she scored the raw data. The tests included the M-FAST, SIMS, SIRS, MMPI, and PAI.[6] Dr. Kruse testified her scoring of the raw data led her to conclude Jones was malingering symptoms of mental illness. She testified malingering is voluntary, conscious, and self-directed behavior aimed at exaggerating symptoms or creating symptoms that do not exist.

As noted above, Dr. Kruse's testimony was incorporated into the sentencing phase. During that phase, Jones provided the State with an affidavit from forensic psychologist Dr. Adriana Flores. Dr. Flores was new to the case and was prepared to testify "regarding errors and incorrect conclusions" on the part of Dr. Kruse, specifically with regard to Dr. Kruse's scoring of the raw data that led her to conclude Jones was malingering. In her affidavit, Dr. Flores stated she was obligated under the American Psychological Association's ethical principles to confront Dr. Kruse about her concerns.

The solicitor lodged three basic objections to Dr. Flores' testimony. First, he argued Dr. Flores' affidavit and purported testimony were "an attack on Dr. Kruse." The solicitor argued that allowing Dr. Flores to testify would "permanently stain . . . [Dr. Kruse's] personal and professional integrity" and intimidate Dr. Kruse to the point that she would be afraid to testify in response to Dr. Flores' allegations. Second, the solicitor argued Dr. Flores would improperly pit her testimony against that of Dr. Kruse. Third, the solicitor argued the State would suffer unfair prejudice if Dr. Flores were allowed to testify without any notice to the State.

The trial judge noted trial had been underway for six weeks, Dr. Flores was not on the witness list, and numerous expert witnesses had already testified for both parties. Defense counsel informed the trial judge that he discovered Dr. Flores' concerns the preceding weekend when defense witness Dr. Julie Dorney asked Dr. Flores to review Dr. Kruse's testing methodology and conclusions. Defense counsel stated that as soon as he became aware of Dr. Flores' interest in testifying, he informed the State. The trial judge considered these arguments and ruled, "I've got to draw the line somewhere . . . . We're too far in the game to call new players. I presume you'll have to proffer her, but I don't think she should be allowed to testify." The record is not clear on this point, but apparently, the defense had Dr. Kruse's

_____

[6] These acronyms stand for the Miller Forensic Assessment of Symptoms Test, the Structured Inventory of Malingered Symptomology, the Structured Interview of Reported Symptoms, the Minnesota Multiphasic Personality Inventory, and the Personality Assessment Inventory, respectively.

report and raw data in advance of trial yet did not secure its own expert to review them.

During her proffer, Dr. Flores testified she was concerned Dr. Kruse had "omitted a validity section" from one of the tests she conducted, and in turn, Dr. Flores "had the feeling that something was being hidden from [Dr. Kruse's] report." The trial judge noted what he termed "improper pitting of witnesses" and warned defense counsel, "Just be careful not to pit the witnesses. . . . If [Dr. Flores] took the raw data and scored it herself, that's rescoring the data. But if she's going to testify to the mistakes Dr. Kruse made, that's pitting witnesses. So characterize your question properly." Dr. Flores explained in detail several tests that Dr. Kruse performed on Jones. Dr. Flores explained the M-FAST and SIMS were screening tests for malingering, and if the scores on those tests are above a certain level, the SIRS should be administered. Dr. Flores testified she reviewed the raw data and determined Jones's scores on the M-FAST and SIMS were below the cut-off levels for malingering; therefore, in Dr. Flores' opinion, Dr. Kruse should not have administered the SIRS. Dr. Flores testified as to her own scoring of the raw data and concluded, "Just looking at the data, I don't think there's enough information there to say that [Jones] was malingering."

In its brief, the State argues the trial court properly excluded Dr. Flores' testimony. The State repeats its grounds for exclusion as witness intimidation; "improper pitting of witnesses"; and Rule 403, SCRE (i.e., the probative value of Dr. Flores' testimony was substantially outweighed by the danger of unfair prejudice to the State). The State also presents an additional argument that Dr. Flores' testimony would have amounted to needless presentation of cumulative evidence under Rule 403.

First, we reject the State's argument Dr. Kruse would have been so intimidated by Dr. Flores' accusations that she would have been afraid to testify in reply. As the State notes in its brief, at the time of trial, Dr. Kruse had served as Chief Neuropsychologist at Prisma Health for eleven years and had been qualified as an expert in the field of neuropsychology over seventy-five times. There is no evidence Dr. Kruse would have been afraid to return to the courtroom and testify in reply. Even if she had been, we question how this would be germane to the admissibility of Dr. Flores' testimony.

Second, as the trial court concluded and as the proffer transcript bears out, Dr. Flores' testimony could have been tailored to avoid any purported "improper pitting of witnesses." The trial court had a firm grasp of the issue and could have resolved all related objections. We therefore reject the State's argument on this ground.

Citing Rule 403, the State claims Dr. Flores' testimony would have been needlessly cumulative in light of the testimony of eight defense experts. Rule 403 provides in part that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or by considerations of . . . needless presentation of cumulative evidence." The State did not argue Dr. Flores' testimony was needlessly cumulative at trial, and the trial court did not consider this ground when excluding Dr. Flores' testimony. We review evidentiary rulings for an abuse of discretion, and on this particular ground, we cannot review a nonexistent ruling.

The State did, however, raise unfair prejudice at trial. The State claims the trial court properly excluded the testimony because under Rule 403, the probative value of Dr. Flores' testimony was substantially outweighed by the danger of unfair prejudice to the State. Of course, the "unfair prejudice" cited by the State is the surprise arising from Jones's late disclosure of Dr. Flores. The State claims this surprise left the State unable to appropriately prepare for and respond to Dr. Flores' testimony. Jones argues he should have been able to use Dr. Flores' testimony to argue before the jury that Dr. Kruse's scoring was faulty and perhaps misleading. Jones, as the proponent of Dr. Flores' testimony, had to establish its probative value; if the evidence had probative value, the State, as the opponent of the evidence, had to establish its probative value was substantially outweighed by the danger of unfair prejudice. We agree with Jones that Dr. Flores' testimony had probative value because it included her rescoring of Dr. Kruse's raw data in a way that purported to rebut Dr. Kruse's conclusions of malingering.

Having determined the evidence had probative value, we next review the trial court's ruling on three fronts. First, was the State prejudiced by the evidence? Here, the prejudice cited by the State was "surprise." There is no question Dr. Flores' testimony was prejudicial to the State; after all, most evidence offered by one party is prejudicial to the other. Second, was this prejudice to the State unfair? Probably so because Jones obtained Dr. Kruse's report before trial and could have secured a qualified individual to review the raw data before Dr. Kruse entered the fray in the eleventh hour. Third, was the probative value of Dr. Flores' testimony substantially outweighed by the danger of unfair prejudice to the State? This is always a difficult question. We recognize trial courts necessarily process and rule upon objections in a rapid-fire setting, and we applaud the trial judge's immediate grasp of the State's objections to Dr. Flores' testimony. The trial judge quickly moved to the most pertinent objection: whether Jones presented Dr. Flores' testimony too late in the game. Implicit in the trial judge's exclusion of Dr. Flores' testimony is that the

probative value of that testimony was substantially outweighed by the danger of unfair prejudice to the State. It is on this point we conclude the trial court erred.

In *State v. Mercer*, we considered a similar challenge to the trial court's exclusion of expert testimony about a capital defendant's brain scan. 381 S.C. 149, 160, 672 S.E.2d 556, 561 (2009). Although a prior witness testified the scan showed a "questionable abnormality[,]" defense expert Dr. John Steedman planned to "render a stronger finding of an abnormality." *Id.* at 160, 672 S.E.2d at 562. The trial court excluded Dr. Steedman's testimony during the sentencing phase, finding he was a surprise witness and his testimony was unduly prejudicial. On appeal, we concluded, "The probative value of Dr. Steedman's excluded testimony was, as a matter of law, not substantially outweighed by its potential for prejudice, as a result of the purported late disclosure or otherwise." *Id.* at 161, 672 S.E.2d at 562. Our conclusion rested on two grounds. First, the trial court never issued a formal discovery order. Second, both Dr. Steedman and the substance of his testimony were disclosed to the State before he was set to testify. Although we found the exclusion of Dr. Steedman's testimony error, we held the error was harmless beyond a reasonable doubt because the brain scan was admitted into evidence; another expert testified as to its abnormality; and Dr. Steedman was allowed to testify "at length" about the defendant's "cognitive deficiencies" and "learning disorder." *Id.* at 161-62, 672 S.E.2d at 562-63.

We emphasize that our holding in *Mercer* does not stand for the black-letter proposition that in every criminal or civil case, a trial court's exclusion of tardy evidence is error under Rule 403. However, in this case, we hold as a matter of law that the probative value of Dr. Flores' testimony was not <u>substantially</u> outweighed by the danger of unfair prejudice to the State. The trial court should have allowed Dr. Flores to testify about her rescoring of Dr. Kruse's raw data.

### i. Harmless Error

Having determined the exclusion of Dr. Flores' testimony was error, we must determine whether the error was harmless. We hold it was harmless. During the guilt phase, Jones presented seven expert witnesses to testify in support of his NGRI defense. This testimony was incorporated into the sentencing phase and was before the jury as mitigation evidence. Additionally, Jones called Dr. Donna Schwartz-Maddox as a mitigation witness during the sentencing phase. A summary of these witnesses' testimony is important, and this summary reveals that each defense witness who gave an opinion as to whether Jones was malingering stated quite unequivocally he was <u>not</u>.

Richard Frierson, M.D., is a general and forensic psychiatrist and a professor of psychiatry at the University of South Carolina School of Medicine. The medical school has a contract with the South Carolina Department of Mental Health (DMH), so Dr. Frierson regularly performs forensic evaluations at DMH's request. Dr. Frierson testified he interviewed Jones six times for a total of nineteen hours and reviewed information from 295 sources. Dr. Frierson opined that at the time of the murders, Jones was sane, or criminally responsible (i.e., Jones could distinguish moral right from moral wrong and could recognize his actions as legally and morally wrong). Dr. Frierson testified that at the time of the murders, Jones had substance-induced psychotic disorder from smoking spice. Jones knew he had a family history of schizophrenia and was convinced the drug-induced "anxious thoughts" he was having were, in fact, schizophrenia. Dr. Frierson testified he has practiced forensic psychiatry for thirty years; he has examined individuals who were malingering and was rather surprised the tests he conducted did not indicate Jones was malingering. Dr. Frierson testified Jones "was trying to convince himself he had schizophrenia so he could live with what he did."

Julie Dorney, M.D., testified for the defense as an expert in forensic psychiatry. Dr. Dorney provided exceedingly detailed testimony on the issue of insanity. She met with Jones eight times before trial—the first time being on the three-year anniversary of the murders. Dr. Dorney testified that at the time of the murders, Jones "suffered from psychotic symptoms, specifically delusional thinking and hallucinations." She testified this was "a major mental illness," and Jones was insane because he did not recognize the legal wrongfulness of his conduct and did not have the capacity to distinguish moral right from moral wrong. She further testified that after Jones killed Nahtahn, he felt the other four children would be better off in Heaven than without parents.

Dr. Dorney testified she always looks for signs of malingering and saw none in Jones. She testified that although a staff member from the South Carolina Department of Corrections (SCDC) questioned whether Jones was malingering, the hundreds of pages she reviewed did not support a finding of malingering. During cross-examination, the State questioned Dr. Dorney about Dr. Kruse's testing. Dr. Dorney stated Jones was not displaying symptoms of schizophrenia at the time of Dr. Kruse's evaluation, so she questioned why anyone would conduct malingering tests at that time. Dr. Dorney stated the malingering tests conducted by Dr. Kruse "are tools that you use if someone is actively reporting symptoms. At the time [Jones] saw [Dr. Kruse], he didn't have any symptoms." Dr. Dorney characterized Dr. Kruse's employment of the tests as "a misuse of the tests." Again, she testified nothing would support the conclusion that Jones was malingering.

April Hames, Ph.D., Jones's marriage therapist, testified for the defense as an expert in marriage and family therapy. Jones's therapy sessions with Dr. Hames took place three to four years before the murders. Dr. Hames testified that during Jones's first session, Jones said he had a "monster" inside of him. Jones repeatedly referenced the monster in subsequent sessions. Dr. Hames testified Jones came to her for help with anxiety, depression, and feelings of inferiority. She diagnosed Jones with recurrent major depressive disorder and unspecified nonpsychotic mental disorder.

Bhushan Agharkar, M.D., testified for the defense as an expert in adult and forensic psychiatry. Dr. Agharkar testified Jones suffered from schizophrenia and minor neurocognitive disorder, the latter of which is commonly referred to as "brain damage." Dr. Agharkar was very informative and detailed how schizophrenia manifests itself in those stricken with the disorder. He noted Jones's mother is schizophrenic, which creates in Jones a "significant genetic loading" for the disorder. Dr. Agharkar testified he always considered the prospect of malingering but determined Jones was not malingering based on his history, brain damage, symptom presentation, and response to medications. Dr. Agharkar also testified that he requested neuropsychologist Erin Bigler, Ph.D., to review Jones's brain imaging studies.

Dr. Bigler testified for the defense as an expert in neuropsychology. Dr. Bigler testified he had particular expertise "in looking at brain imaging methods and how to use those findings to relate to the behavior of the individual." Evidence introduced at trial established that Jones was involved in a car accident at age fifteen. The accident left Jones with a brain injury and visible indentation on his forehead. After reviewing Jones's brain imaging studies, Dr. Bigler testified he could immediately tell Jones had "a significant traumatic brain injury and . . . skull defect." Dr. Bigler testified there is a connection between traumatic brain injury and schizophrenia. Ultimately, Dr. Bigler recommended Jones's brain imaging studies be reviewed by a neuroradiologist.

Travis Snyder, M.D., testified for the defense as an expert in neuroradiology. Dr. Snyder examined MRI scans of Jones's brain and found a large left frontal depressed skull fracture, indicating Jones sustained a severe traumatic brain injury at some point in his life. Among other abnormalities, Dr. Snyder found thinning of the cortex and corpus collosum, which he testified are associated with schizophrenia and schizoaffective disorder. Dr. Snyder testified frontal lobe injuries—such as the one Jones sustained—often result in cognitive problems, personality changes, risk taking, disinhibition, and behavior spontaneity.

Donna Schwartz-Maddox, M.D., testified for the defense as an expert in forensic psychiatry. Her testimony was very detailed on the subject of schizophrenia and its causes and treatment. Dr. Schwartz-Maddox testified she first saw Jones in an SCDC hospital on September 13, 2014, just fifteen days after the murders. She testified "there was no question in [her] mind" Jones "was clearly psychotic" that day. She testified Jones "me[t] the diagnostic criteria for schizophrenia." On the issue of whether Jones's condition was substance induced—in his case, whether it was caused by smoking spice—Dr. Schwartz-Maddox testified most instances of substance-induced psychosis resolve within a month when the patient is hospitalized and properly medicated. She testified Jones remained in the hospital until trial and was properly medicated but still had symptoms of psychosis. Dr. Schwartz-Maddox testified that before trial began, Jones was housed at SCDC and was prescribed a very high dose of Geodon, an antipsychotic drug. However, when trial began, Jones was moved to the Lexington County Detention Center, and his Geodon dosage was reduced to a much lower level. According to Dr. Schwartz-Maddox, this caused Jones's psychotic symptoms to worsen, which lent legitimacy to her conclusion that he was not malingering. Dr. Schwartz-Maddox testified she had "not seen [Jones] intentionally fake his symptoms," and if anything, Jones underreported his symptoms.

Beverly Wood, M.D., Chief of Psychiatry at SCDC, testified for the defense as an expert in psychiatry. Dr. Wood diagnosed Jones with schizoaffective disorder and prescribed a medication regimen that included the aforementioned Geodon. Dr. Wood testified as to Jones's family history of schizophrenia. Jones told Dr. Wood he had been hearing voices since he was twelve years old. Dr. Wood noted Jones displayed "flight of ideas," "pressured speech," and disregard for personal hygiene, all of which indicate mental illness. Dr. Wood testified that in the SCDC setting, a number of inmates fake mental illness for various reasons, but nothing led her to believe Jones was malingering.

Jones admits in his brief that he "presented significant evidence to prove he was not sane at the time he killed his children." According to Jones, Dr. Frierson, Dr. Dorney, Dr. Hames, Dr. Agharkar, Dr. Schwartz-Maddox, and Dr. Wood "presented significant evidence" that he was mentally ill and not malingering. Additionally, the detailed explanations of Jones's brain damage given by Dr. Bigler and Dr. Snyder were front and center for the jury as mitigation evidence. In light of the extensive testimony that Jones was not malingering, we hold any error in the trial court's exclusion of Dr. Flores' testimony was harmless. In fact, the only witness who suggested Jones was malingering was Dr. Kruse. Dr. Dorney directly challenged the propriety of Dr. Kruse administering malingering tests because Jones

was not displaying symptoms of schizophrenia at the time. While only Dr. Flores rescored Dr. Kruse's data, we hold the issue of malingering was exhaustively and fully addressed.

Although Dr. Flores' testimony would have purportedly cast doubt on Dr. Kruse's scoring and allegedly flawed approach to concluding Jones was malingering, Jones presented a wealth of evidence that he had brain damage, was schizophrenic, and was not malingering. We hold it is not reasonably likely Dr. Flores' testimony would have affected the jury's decision to impose a death sentence. *See Skipper v. South Carolina*, 476 U.S. 1, 8 (1986) (stating that in the sentencing phase of a capital trial, an error is not harmless if "it appears reasonably likely that the exclusion of evidence . . . may have affected the jury's decision to impose the death sentence"); *Chaffee v. State*, 294 S.C. 88, 91, 362 S.E.2d 875, 877 (1987); *State v. Key*, 256 S.C. 90, 93-94, 180 S.E.2d 888, 890 (1971). Therefore, the trial court's exclusion of Dr. Flores' testimony was harmless.

## 2. Limitation of Testimony Pertaining to Jones's Future Dangerousness, Remorse, and Social History

As noted above, the admission of evidence is left to the sound discretion of the trial court, and generally, evidentiary rulings will not be reversed on appeal absent a prejudicial abuse of discretion. *Whaley*, 305 S.C. at 143, 406 S.E.2d at 372; *Cope*, 405 S.C. at 343-44, 748 S.E.2d at 208.

Although the Eighth Amendment recognizes a capital defendant's right to present mitigation evidence, that right is limited by general evidentiary principles. *See Jurek v. Texas*, 428 U.S. 262, 271 (1976); *Mercer*, 381 S.C. at 161, 672 S.E.2d at 562. Specifically, to be admissible, mitigation evidence must be relevant. *Lockett*, 438 U.S. at 604 n.12; *Payne v. Tennessee*, 501 U.S. 808, 822 (1991); *see State v. Northcutt*, 372 S.C. 207, 221, 641 S.E.2d 873, 880 (2007); *State v. Dickerson*, 395 S.C. 101, 116, 716 S.E.2d 895, 903 (2011). "The meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" than it is in any other trial. *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. Evidence that is not relevant should be excluded. *See* Rule 402, SCRE. In the context of capital sentencing, "if the sentencer could reasonably find that [mitigation evidence] warrants a sentence less than death, . . . . the Eighth Amendment requires that the jury be able to consider and give effect to that evidence." *Tennard v. Dretke*, 542

U.S. 274, 285 (2004) (cleaned up) (first quoting *McKoy*, 494 U.S. at 441; and then quoting *Boyde*, 494 U.S. at 377-78).

### i. Future Dangerousness

During the sentencing phase, defense counsel proffered the testimony of Sergeant Barry Sowards. Sergeant Sowards testified about an encounter he had with Jones while transporting Jones from Mississippi to South Carolina. According to Sergeant Sowards, when he and the extradition team stopped at a rest stop, the other team members went inside, and he remained in the vehicle with an automatic weapon on his lap. Noticing the weapon, Jones told Sergeant Sowards, "You guys don't need automatic weapons for me. I'm not going to hurt you." Sergeant Sowards replied, "These weapons are not for you, in particular, [they're] for everyone trying to kill you."

Defense counsel sought to introduce Sergeant Sowards' response as mitigating evidence that Jones did not present a risk of future dangerousness. After hearing Sergeant Sowards' proffered testimony, the trial judge ruled, "You can get Tim's response in, but Detective Sowards' response, to me, is his personal opinion and not relevant to Mr. Jones character in any way. I think it goes to Mr. Sowards' training as an officer, that's his job to protect him, it is Mr. Sowards' character."

We affirm the trial court's ruling that Sergeant Sowards' proffered testimony was not relevant to Jones's future dangerousness. The testimony reflected Sergeant Sowards' speculative opinion about how the public perceives Jones. It was not based on Sergeant Sowards' own perception and had nothing to do with Jones's actual dangerousness.

### ii. Remorse

Before the jury, Sergeant Sowards testified he had been with Jones throughout the entire trial. Defense counsel classified Sergeant Sowards as Jones's "handler" and then asked whether he witnessed Jones crying during trial. Sergeant Sowards replied, "Yes," upon which the following exchange took place:

**Defense Counsel:** Do you believe that those are crocodile tears?

**Deputy Solicitor:** Objection, Your Honor, speculation.

**The Court:** I sustain the objection.

**Defense Counsel:** When you've seen him crying, do you believe that his remorse is real?

**Deputy Solicitor:** Objection, speculation.

**The Court:** Sustained.

Defense counsel argued Sergeant Sowards' testimony demonstrated Jones's remorse. At no point, however, did defense counsel proffer Sergeant Sowards' responses to these questions.

Even assuming Sergeant Sowards would have testified that he thought Jones's tears were real and Jones's remorse was genuine, we hold any error in excluding this testimony is harmless. A fleeting mention of Jones's remorse, if admitted, would not have affected the jury's decision to impose a death sentence. *See Skipper*, 476 U.S. at 8; *Chaffee*, 294 S.C. at 91, 362 S.E.2d at 877; *Key*, 256 S.C. at 93-94, 180 S.E.2d at 890.

### iii. Social History

When Roberta Thornsberry—Jones's paternal grandmother—testified during the sentencing phase, defense counsel inquired about her life before Jones was born. The State objected, upon which the trial court excused the jury. Noting that he consistently "directed the [d]efense to only ask questions from [Jones's] birth forward" in the guilt phase, the trial judge asked defense counsel why his ruling should differ in the sentencing phase. Defense counsel responded by requesting to proffer Thornsberry's testimony. The trial judge allowed the proffer. Thornsberry's testimony detailed a family history full of abandonment, incest, abuse, and exploitation.

Although the trial judge recognized that evidence of Thornsberry's horrific childhood certainly "impacted [Jones] to some degree," he ruled such evidence would be irrelevant to Jones's character and would, therefore, confuse the jury. Defense counsel objected to the ruling, and the trial judge clarified Thornsberry would be allowed to testify generally about her "childhood from a broken home and traumatic history" but would not be allowed to testify about intimate details that were irrelevant to Jones's character.

Anticipating the trial court's ruling would equally apply to the testimony of Jones's father Timothy Ray Jones Sr. (Senior), defense counsel proffered Senior's testimony. Senior explained how his childhood was marked by fear, violence, trauma, mental illness, physical abuse, and substance abuse. At the end of the

proffer, defense counsel again requested the jury be permitted to hear testimony about events occurring before Jones's birth. The trial court did not allow this testimony.

Defense counsel also proffered the testimony of Deborah Grey, a social historian. The disputed portion of Grey's proffer began with Thornsberry's childhood and continued until Jones's birth; it largely tracked Thornsberry's and Senior's proffers, albeit with more expansive details. At the conclusion of Grey's proffer, the trial judge made the following statement:

> I want to think of a way and I suggest you all come up with a way for this lady to say, this lady's summary of Ms. Thornsberry's mental history, Ms. [Turner] -- Cynthia [Turner's] history . . . -- without going through every single minute detail. . . . All of the social psychologists and psychiatrists said the Jones family . . . had a huge bunch of illnesses, medical, suicides, physical abuse, sexual abuse. I think she can say things like that without saying the grandma was sexually abused 18 times by the time she was six . . . .

The trial judge later instructed defense counsel to "use a broader brush rather than a detailed brush" and to "present some mitigating facts without becoming the Dr. Phil show." The trial judge continually advised defense counsel to give the facts but to avoid the details of each fact: "Put up some rails on the alley where you don't go in the gutter. . . . If you get too detailed, I'm going to say move on."

Before the jury, Grey was permitted to testify extensively about Jones's family history. She testified that both the paternal and maternal sides of Jones's family were littered with attachment and protection issues. She recounted the rape, torture, abandonment, trafficking, substance abuse, domestic violence, and mental illness Jones's caretakers endured and opined this was the family dynamic into which Jones was born. Nonetheless, Jones argues the trial court erred in forcing him to deliver a "condensed and sanitized" social history and in repeatedly instructing Grey to "move on" when her testimony became too detailed. We disagree and, therefore, affirm the trial court's limitations.

Although events occurring to Thornsberry and Senior before Jones's birth undoubtedly shaped their parenting methods and family environment, these events were irrelevant to Jones's character. In our view, Jones disregards the requirement that evidence of a defendant's social history be relevant and concerned with the defendant's character or record. *See Lockett*, 438 U.S. at 604-05, 604 n.12; *Eddings v. Oklahoma*, 455 U.S. 104, 113-15 (1982); *United States v. Tsarnaev*, 142 S. Ct.

1024, 1038 (2022) ("[W]e have expressly held that 'the Eighth Amendment does not deprive' a sovereign 'of its authority to set reasonable limits upon the evidence a [capital] defendant can submit, and control the manner in which it is submitted.'" (alteration in original) (quoting *Oregon v. Guzek*, 546 U.S. 517, 526 (2006))).  It would be far too remote to conclude external events impacting Jones's family members before his birth directly affected Jones's own character.  If anything, these events affected the character of Jones's family members—an issue that was not before the jury during sentencing.

Even assuming the trial court erred by limiting the testimony of Thornsberry and Senior, any error is harmless.  Grey was permitted to testify considerably about Jones's family history, including all relevant details.  For these reasons, we affirm the trial court's limitations.

### 3.  Exclusion of Cynthia Turner's Pre-Recorded Testimony

During the sentencing phase, defense counsel sought to publish the pre-recorded testimony of Jones's mother—Cynthia Turner—as mitigation evidence of Jones's state of mind and mental illness.  In the recording, Turner was unable to recall basic facts about her personal history and appeared detached from reality.  When asked about her father, mother, and siblings, Turner said she did not know them well despite spending the majority of her childhood with them.  Turner also claimed she did not know Senior, even though she dated and was married to him for five years.  Turner was unsure why Senior was awarded primary custody of Jones after their divorce, and she did not remember giving birth to one of her other children.  When asked how she felt about Jones, Turner replied, "He's a nice kid, but I don't understand how he did that about his kids."

Noting numerous experts had already testified about Turner's mental illness, the trial judge questioned the relevance of her testimony.  Defense counsel responded, "It's his mother, his mother who is diagnosed with schizophrenia, in which a number of other people have diagnosed Tim with, and what condition Tim could end up in. . . . It's his future."  The solicitor countered that Turner's testimony was prejudicial because it was unclear whether her exhibited symptoms were signs of schizophrenia, manifestations of another disorder, or medicinal side effects.  The following exchange then took place:

> **Defense Counsel:**  Mitigation is any reason not to give death.
> The fact that his own mother couldn't come to his trial is likely a
> reason for a Juror not to give death.

**The Court:** How are you prevented from arguing that right now?

**Defense Counsel:** I'm not.

. . . .

**The Court:** All right. I'm not letting it in then. You talked me in to it.

**Defense Counsel:** We object under *State v. Mercer* and that relevant mitigation should be admitted and 403 shouldn't be used to exclude mitigation evidence.

**The Court:** It's a broader 403. That video was done late, it was done during jury selection. There's too many things that are unknown with her medical condition. And the State has not challenged whatsoever that she has severe mental challenges, issues, is institutionalized. All that's free game for you to argue that she couldn't come for those reasons. She was not allowed to come. So you are certainly welcome to argue that. I think it's inflammatory and I don't think that it's a proper video to be introduced in this phase of the case. So I'm not going to allow it.

We affirm the trial court's ruling that Turner's testimony had no probative value and risked confusing the issue to be decided—Jones's mental state—with the issue that was demonstrated by the testimony—Turner's own mental state. Jones claims *Weik v. State*, 409 S.C. 214, 761 S.E.2d 757 (2014), supports the recording's admission because Turner's "bizarre behavior . . . would have corroborated the defense mental health experts' description of schizophrenia." However, Jones's reliance on *Weik* is misplaced. In *Weik*, defense counsel conducted numerous pretrial interviews with the defendant's family members, coworkers, and acquaintances, all of whom "revealed [his] childhood was traumatic, filled with emotional and physical abuse at the hands of his psychotic father[.]" *Id.* at 217, 761 S.E.2d at 758. Despite abundant evidence, defense counsel presented only one mitigation witness—the defendant's sister—who provided "extremely limited testimony, which was general, vague, and offered no detail or insight into the degree of abuse [the defendant] suffered as a child." *Id.* at 235, 761 S.E.2d at 768. We remanded the case for a new sentencing trial because the evidence presented by defense counsel failed to sufficiently reveal the defendant's "abusive and dysfunctional childhood" as well as his "genetic predisposition to schizophrenia" and hallucinogenic symptoms at the time of the crime. *Id.* at 238-39, 761 S.E.2d at 769-70.

Unlike in *Weik*, where defense counsel presented minimal testimony about the defendant's abusive family background, Jones's extensive social history was elicited through the testimony of Thornsberry, Senior, and Grey. While the social history testimony in *Weik* spanned merely three pages of the trial transcript, the testimony here was set forth in more than one hundred pages in the sentencing phase alone. Jones argues that at the very least, Turner's testimony bore on mitigating factors related to his mental state; however, Turner's testimony was relevant to her mental state, not Jones's. Neither Turner's diagnosis nor the hereditary nature of schizophrenia was disputed. We therefore affirm the trial court's exclusion.

### 4. Admission of Autopsy Photographs

During the sentencing phase, the trial court admitted—over Jones's objection—ten autopsy photographs (two per child). The issue before us is whether the probative value, if any, of the photographs was substantially outweighed by the danger of unfair prejudice under Rule 403, SCRE.

Jones argued at trial that the photographs were inadmissible under Rules 401 and 403, SCRE, because the State had already proved the existence of statutory aggravating circumstances and the "absolutely horrific" and "nightmarish" photographs would do nothing more than "arise sympathy or prejudice." The solicitor responded that the photographs "show[] [Jones's] character, the work of his hands" because they "depict the bodies of the victims in the same condition he left them in -- or condition he left them to become in." The solicitor argued the photographs were relevant to show how Jones bagged up his children's bodies, drove them around for more than a week, and deliberately left them in the hot sun to accelerate decomposition.

After reviewing cases cited by both parties, the trial judge allowed the State to admit two autopsy photographs per child, citing several cases along with Rules 401, 402, and 403, SCRE. The trial judge determined the photographs, "even though very unpleasant," were probative of Jones's "conduct of packing the children in the bags and contorting the bodies in different fashions, putting them out there in the woods." Over Jones's objection, the photographs were admitted during the testimony of expert witness Dr. Janice Ross—the forensic pathologist who performed the autopsies and took the disputed photographs. Dr. Ross testified during the guilt phase and was recalled by the State during the sentencing phase for the purpose of having the photographs admitted into evidence.

Although Dr. Ross described what was depicted in each photograph, the solicitor did not publish the photographs in open court—out of what the solicitor

stated was his "respect for the jury." Dr. Ross testified Elias' cause of death was asphyxia due to strangulation; Gabriel's cause of death was homicidal violence with probable strangulation; and Merah's, Abigail's, and Nahtahn's causes of death were homicidal violence. Dr. Ross testified there was a wound to Nahtahn's knee—which was depicted in a photograph published during the guilt phase—that appeared to be caused by a sharp instrument "like a saw or a knife."

After Dr. Ross's testimony, defense counsel noted, "[The State] needed the photographs to show Dr. Ross in testimony and they were not used for that purpose, which enhances the fact that they're just being used to create an emotional impact." Defense counsel then moved to have the photographs kept in the courtroom during jury deliberations so that a record could be made of any emotional impact the photographs evoked if a juror asked to see them. The trial court denied this request, and the photographs went into the jury room along with other trial exhibits.

"The determination of the relevancy and materiality of a photograph is left to the sound discretion of the trial judge" whose "rulings will not be disturbed absent a showing of probable prejudice." *State v. Kornahrens*, 290 S.C. 281, 288, 350 S.E.2d 180, 185 (1986); *see Evins*, 373 S.C. at 421, 645 S.E.2d at 912. In the sentencing phase of a capital trial, photographs may be offered as extenuating, mitigating, or aggravating evidence to "direct the jury's attention to the specific circumstances of the crime and the characteristics of the offender." *State v. Haselden*, 353 S.C. 190, 199, 577 S.E.2d 445, 450 (2003) (quoting *State v. Matthews*, 296 S.C. 379, 390, 373 S.E.2d 587, 594 (1988)).

"[I]t is well-established that photographs calculated to arouse the sympathies and prejudices of the jury are to be excluded if they are irrelevant or unnecessary to the issues at trial." *State v. Middleton*, 288 S.C. 21, 24, 339 S.E.2d 692, 693 (1986); *see* Rule 401, SCRE; Rule 403, SCRE. Photographs are relevant if they "depict the bodies of the murder victims in substantially the same condition in which the defendant left them." *Kornahrens*, 290 S.C. at 289, 350 S.E.2d at 185. Even if relevant, photographs are unfairly prejudicial if they "create a 'tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one.'" *State v. Franklin*, 318 S.C. 47, 55, 456 S.E.2d 357, 361 (1995) (quoting *State v. Alexander*, 303 S.C. 377, 382, 401 S.E.2d 146, 149 (1991)); *see* S.C. Code Ann. § 16-3-25(C)(1) (2015).

In several capital trials, we have considered the admissibility of autopsy photographs.[7] We explained in *Franklin*, "The criteria is not . . . that photographs become inadmissible because they graphically depict a gruesome scene. Rather, the question is whether the photographs are unfairly prejudicial so as to outweigh the probative value." 318 S.C. at 55, 456 S.E.2d at 361. We noted the autopsy photographs in that case were highly relevant to the issue of physical torture delivered upon the victim by the defendant. In *Middleton*, we considered a challenge to the trial court's admission of photographs showing the victim's scalp pulled away from her skull and her surgically opened vaginal cavity filled with semen. 288 S.C. at 24, 339 S.E.2d at 693. Because it was clear the facts were not in dispute and because the testimony of a forensic pathologist "negated any arguable evidentiary value of the photographs[,]" we held the "prejudice created by the photographs clearly outweighed *any* evidentiary value." *Id.* at 23-24, 339 S.E.2d at 693.

Nine months after deciding *Middleton*, we decided *Kornahrens*, 290 S.C. at 281, 350 S.E.2d at 180. In *Kornahrens*, the trial court admitted several photographs during sentencing that depicted the autopsies of two murder victims. Photographs of one victim showed her lying on an autopsy table in the same condition her body was found, and photographs of the other victim showed knife wounds to his chest, back, and thigh. We concluded the photographs were properly admitted because "while not pleasant to look at, they showed what the defendant himself did to the bodies," and the bodies were not "altered by decomposition or by any other outside force." *Id.* at 289, 350 S.E.2d at 186 (cleaned up).

---

[7] Notable cases outside of those discussed in this subsection include *State v. Patrick*, 289 S.C. 301, 308-09, 345 S.E.2d 481, 485 (1986) (holding an autopsy photograph was "not substantially necessary" and was "highly prejudicial" because it showed the victim lying on an autopsy table with a "considerable amount of blood" and without any depiction of the crime scene or post-mortem abuse), *overruled on other grounds by Brightman v. State*, 336 S.C. 348, 520 S.E.2d 614 (1999); *State v. Rosemond*, 335 S.C. 593, 597, 518 S.E.2d 588, 590 (1999) (holding the probative value of crime scene and autopsy photographs outweighed any prejudicial effect because they "served to corroborate the pathologist's testimony describing the position of the victims as they were dying and the wounds each received"); and *State v. Johnson*, 338 S.C. 114, 129-30, 525 S.E.2d 519, 526-27 (2000) (holding autopsy photographs that depicted the victim's nearly severed shoulder and her head wound were admissible because although "difficult to look at, they nevertheless revealed the true nature of the attack and would have permitted the jury to comprehend the precise damage inflicted by the [murder weapon]").

More recently, we considered a challenge to the trial court's admission of several autopsy photographs during sentencing, each "graphically depict[ing] the injuries of the victim[.]" *State v. Torres*, 390 S.C. 618, 624, 703 S.E.2d 226, 229 (2010). We acknowledged "some of the photographs were close-ups of the victims' injuries and were graphic in nature," but we concluded the "purpose of the close-ups was to help identify the nature of the particular injury" and "show what the defendant did to the victims, which goes straight to circumstances of the crime." *Id.* (cleaned up). We upheld the trial court's admission because although the crime was "particularly horrific[,] . . . the admission of the photographs did not unduly prejudice the jury." *Id.* Despite affirming the trial court's admission, we explained the photographs were "at the outer limits of what our law permits a jury to consider." *Id.* In light of our growing concern in the admission of autopsy photographs, we "strongly encourage[d] all solicitors to refrain from pushing the envelope on admissibility in order to gain a victory which, in all likelihood, was already assured because of other substantial evidence in the case." *Id.*

After *Torres*, we again considered the admissibility of horrendous autopsy photographs, albeit in a noncapital trial. *See State v. Collins*, 409 S.C. 524, 531-34, 763 S.E.2d 22, 26-28 (2014). In *Collins*, the defendant was indicted for several crimes arising from a ten-year-old boy being mauled to death by the defendant's unrestrained dogs. At trial, the State offered into evidence a group of pre-autopsy photographs taken by a forensic pathologist that demonstrated "the dangerous propensities of the dogs, the manner and extent of the attack, and [the defendant's] criminal negligence[.]" *Id.* at 532, 763 S.E.2d at 27. The "nature and extent" of the victim's injuries were in dispute, and the photographs "show[ed] the boy's exposed jawbone and upper arm bone[] and the areas where his chest and face had been partially eaten during the dog attack." *Id.* at 532, 533 n.3, 763 S.E.2d at 27 & n.3. The trial court admitted the photographs, and the court of appeals reversed, holding the probative value of the "disturbing" and "gruesome" photographs was substantially outweighed by the danger of unfair prejudice. *State v. Collins*, 398 S.C. 197, 202, 208-10, 727 S.E.2d 751, 754, 757-58 (Ct. App. 2012).

In *Collins*, we acknowledged the photographs were graphic, but we concluded they were "highly probative, corroborative, and material in establishing the elements of the offenses charged; their probative value outweighed their potential prejudice; and the court of appeals should not have invaded the trial court's discretion in admitting this crucial evidence based on its emotional reaction to the subject matter presented." 409 S.C. at 535, 763 S.E.2d at 28 (cleaned up). We observed photographs should not be excluded just because they are gruesome. *Id.* at 535-36, 763 S.E.2d at 28.

As we noted in *Kornahrens*, "The purpose of the bifurcated proceeding in a capital case is to permit the introduction of evidence in the sentencing proceeding which ordinarily would be inadmissible in the guilt phase." 290 S.C. at 289, 350 S.E.2d at 185. With respect to photographs, we stated, "In determining whether to recommend a sentence of death, the jury may be permitted to see photographs which depict the bodies of the murder victims in substantially the same condition in which the defendant left them." *Id*. We also noted that even though the trial court must balance the probative value of evidence against the danger of unfair prejudice, the scope of the probative value of evidence in the sentencing phase is "much broader" than in the guilt phase. *Id*. at 289, 350 S.E.2d at 186. An obvious takeaway from *Kornahrens* is that the evidence must still have at least some probative value for it to enjoy that "much broader" scope.

Unlike the photographs admitted in *Torres*, *Collins*, and *Kornahrens*, the autopsy photographs in this case were of no probative value. The photographs here do not depict the children's bodies in substantially the same condition in which Jones left them. The photographs depict the children's bodies in the advanced stages of decomposition occurring in the three days between the time Jones dumped the bodies to the time law enforcement discovered them. The bodies were so severely decomposed that with the exception of one photograph, neither strangulation nor ligature marks were visible to corroborate Dr. Ross's testimony. The State does not claim Jones altered his children's faces or limbs, yet several photographs showed extensive tissue loss appearing as though an animal had eaten their faces and limbs.

Even assuming the photographs had some probative value because they purport to show Jones's character through the method and manner in which he bagged and disposed of the bodies, we hold as a matter of law that under Rule 403, such probative value—even in its "much broader" form as noted in *Kornahrens*—was substantially outweighed by the danger of unfair prejudice to Jones. The photographs show the children's bodies in a state of complete discoloration; they were engulfed in maggots and contorted beyond recognition. Some of the children's faces were missing, a number of their limbs had been eaten by animals, and one child's head had decomposed to skeletal remains.

The solicitor's statement that he was not going to publish the ten admitted photographs in open court "out of respect for the jury" is telling on the issue of whether any probative value was substantially outweighed by the danger of unfair prejudice. Also, when Jones offered the photographs into evidence during the guilt phase, the solicitor, after first objecting on relevance grounds, argued the photographs should be excluded under Rule 403:

> The photographs are far more prejudicial than probative. I think what Jones is trying to do is basically use shock value <u>to diminish the shock</u> should there be a second half of this case. In the second phase of this case, we get to show the characteristics of the crime, the defendant, how the victims were found. The photographs become probative at that point, relevant at that point. Right now, they're not.

(emphasis added) (cleaned up). The solicitor's words "to diminish the shock" are even more indicative that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice. We observed in *Torres* that "[p]hotographs calculated to arouse the sympathy or prejudice of the jury should be excluded if they are irrelevant or not necessary to substantiate material facts or conditions." 390 S.C. at 623, 703 S.E.2d at 228.

Based on the record before us, we hold the photographs had no probative value. We hold that even if the photographs had probative value, the broader probative value implicated by *Kornahrens* was substantially outweighed by the danger of unfair prejudice to Jones.

### i.    Harmless Error

Having determined the autopsy photographs were admitted in error, we must determine whether the error was harmless. There is no question that the murders perpetrated by Jones were horrific—perhaps the most horrific imaginable. After running six-year-old Nahtahn to death, Jones strangled seven-year-old Elias to death while Elias begged Jones not to kill him. Jones strangled eight-year-old Merah to death while she pleaded, "Daddy, I love you." Jones strangled one-year-old Abigail and two-year-old Gabriel to death with a belt because their necks were too small for Jones to strangle with his bare hands. Jones then packed his children's bodies in plastic bags, stacked them in the back seat of his vehicle, and drove across several states, all while trying to decide what to do. As he drove, Jones bought spice, trash bags, chemicals, goggles, a dust mask, and a jab saw. He searched the internet for applicable extradition laws and local dumpsites, landfills, and campgrounds. He wrote a note reading in part, "Melt bodies," "Sand to dust or small pieces," and "Day 1: Burn up bodies. Day 2: Sand down bones. Day 3: Mexican Border☺, dissolve, and discard." His expression of happiness about escaping to Mexico is particularly compelling. While the autopsy photographs should not have been admitted, we properly take note of Jones's calculated efforts to dispose of his children's bodies in a remote area to evade responsibility for what he had done.

Were the autopsy photographs horrific? Absolutely. Were they inadmissible under Rule 403? Yes, for the reasons we have explained. However, after weighing the horrific facts of this case against the improper admission of the photographs, we hold the photographs did not contribute to the jury's sentence of death. *See Skipper*, 476 U.S. at 8; *Chaffee*, 294 S.C. at 91, 362 S.E.2d at 877; *Key*, 256 S.C. at 93-94, 180 S.E.2d at 890.

### C. Proportionality Review

Pursuant to South Carolina Code section 16-3-25, we must conduct a proportionality review of Jones's death sentence. We find the sentence was not the result of passion, prejudice, or any other arbitrary factor and was instead supported by the aggravating factors alleged by the State, as set forth in subsections 16-3-20(C)(a)(9) (murder of two or more persons by one act or pursuant to one scheme or course of conduct) and (10) (murder of a child eleven years of age or younger). With the possible exception of *State v. Wilson*, 306 S.C. 498, 413 S.E.2d 19 (1992), in which the defendant was sentenced to death for murdering two eight-year-old girls on an elementary school campus, there is not a comparable case to the one before us. Frankly, the horrific murders perpetrated by Jones are incapable of comparison in this state. *Cf. Kornahrens*, 290 S.C. at 283-84, 290-91, 350 S.E.2d at 182-83, 186-87; *Moore v. Stirling*, 436 S.C. 207, 229, 871 S.E.2d 423, 435 (2022); *State v. Bell*, 302 S.C. 18, 21-22, 39-40, 393 S.E.2d 364, 366-67, 376 (1990); *State v. Passaro*, 350 S.C. 499, 501-02, 508-10, 567 S.E.2d 862-64, 867-68 (2002). Therefore, Jones's death sentence is neither excessive nor disproportionate.

### Conclusion

For the foregoing reasons, we affirm Jones's convictions and death sentence.

**AFFIRMED.**

**BEATTY, C.J., KITTREDGE, J. and Acting Justice Kaye J. Hearn, concur. FEW, J., concurring in a separate opinion.**

**JUSTICE FEW:** I concur in the majority opinion in all respects except as to subsection B.4. I would hold the trial court acted within its discretion to admit two autopsy photographs of the badly decomposed body of each child, and thus, the admission of the photographs was not error under Rule 403 of the South Carolina Rules of Evidence. The majority is correct the photographs are gruesome, and were certain to cause a forceful, emotional reaction from the jury. Like the other Justices, I have seen—and sat with—these photographs. It is not possible to describe them. They are literally unbearable. A death penalty trial, however—like a man's heinous murder of his own children—is itself a gruesome business, and even without photographs such as these, evidence of what this man did to his children certainly caused a forceful, emotional reaction from the jury. There is hardly anything "unfair" in allowing the jury to see—not just hear—what this man did to the bodies of his children. It is simply not possible to sanitize the murder of these five innocent children, nor for that matter the trial of the man who did it, nor certainly the evidence on which the State seeks to convince the jury to kill that man through the death penalty. Timothy Ray Jones Jr. took a long series of planned and deliberate actions, first to murder his own children, then to conceal his vicious crimes, and finally to leave the bodies of *his own children* for the purpose of having them deteriorate to the condition shown in the photographs. His crimes were unspeakable; his efforts to get away with his crimes were unconscionable; he is despicable. The photographs show all that, and thus, the photographs have probative value. In my view, the trial court's determination that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice was a reasonable decision and within the trial court's discretion. I would find no error.